*FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                   :
GARFIELD O. GAYLE, *et al.*        :
                                   :
                    Plaintiffs,    :        Civil Action No. 12-2806 (FLW)
                                   :
         v.                        :
                                   :               OPINION
                                   :
JEH JOHNSON, *et al.*,             :
                                   :
                    Defendants.    :
                                   :
_____   :

<u>WOLFSON, United States District Judge</u>:

This putative class action challenges the constitutionality of detention procedures related to mandatory detention of aliens under 8 U.S.C. § 1226(c), codified as the Immigration and Naturalization Act ("INA").  Putative class representatives Garfield O. Gayle ("Gayle") and Neville Sukhu ("Sukhu") (collectively, "Plaintiffs" or "Named Plaintiffs") aver that they and other similarly situated individuals in New Jersey have been subjected to unconstitutional mandatory immigration detention under § 1226(c) by the United States Department of Homeland Security, Immigration and Customs Enforcement ("DHS"/"ICE").  In that connection, Plaintiffs challenge (1) the standards to determine whether an alien is improperly designated as subject to

mandatory detention (also known as *Joseph* hearings,[1] which was first established in *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999)); (2) the adequacy of notice given to those mandatorily detained aliens regarding their right to a *Joseph* hearing, and (3) the lack of a contemporaneous verbatim record of *Joseph* hearings. Plaintiffs seek declaratory and injunctive relief to enjoin the Government[2] from carrying out the current mandatory detention procedures and to require the Government to implement constitutionally adequate procedures.

The Government moves to dismiss all of Plaintiffs' claims or, in the alternative, moves for summary judgment.[3]   The Government contends that (1) Named Plaintiffs

---

[1]   The Government notes that the Executive Office of Immigration Review "does not refer to custody redetermination hearings under 8 C.F.R. 1003.19(h)(2)(ii) as '*Joseph* hearings' and instead uses the terms 'custody determination,' [']bond hearing,' and 'custody redetermination hearing' interchangeably to refer to all custody reviews authorized under 8 C.F.R. § 1003.19." Defs.' Supp'l Stmt. of Mat'l Facts at ¶ 1. The Court will use the terms "*Joseph* hearing" and "custody redetermination hearing" interchangeably throughout this Opinion.

[2]   The various state and local government defendants include: Jeh Johnson, Secretary of the DHS; Eric Holder, United States Attorney General; John Morton, Director of ICE; Juan Osuna, Director of the Office of Immigration Review; John Tsoukaris, Field Office Director for Enforcement and Removal Operations, Newark Field Office of ICE; Christopher Shanahan, Field Office Director for Enforcement and Removal Operations, New York City Field Office of ICE; Ray Simonse, Acting Field Office Director for Enforcement and Removal Operations, New York City Field Office of ICE; Joseph Trabucco, Director of the Delaney Hall Detention Facility; Orlando Rodriguez, Warden of the Elizabeth Contract Detention Facility; Roy L. Hendricks, Warden of the Essex County Correctional Facility; Oscar Aviles, Director of the Hudson County Correctional Facility; Robert Bigott, Warden of  the Bergen County Jail; and Brian Elwood, Warden of the Monmouth County Correctional Institution.

[3]   Because I find that issues raised by both parties are legal in nature, but based upon affidavits and discovery, the Government's motion to dismiss is converted to a motion for summary judgment.

lack standing to bring their claims on behalf of the putative class; (2) Plaintiffs' adequacy of notice claim is either meritless or moot; (2) Plaintiff's' proposed new standard regarding the burden of proof at a *Joseph* hearing is not mandated by the Constitution. In response, Named Plaintiffs oppose the Government's motion and cross-move for summary judgment.  Named Plaintiffs also seek to certify a class consisting of "all individuals detained within the State of New Jersey" pursuant to 8 U.S.C. § 1226(c) "who have a substantial challenge to 'threshold deportability' or 'inadmissibility' on one of the statutory grounds that trigger mandatory detention."

For the following reasons, the Court decides the parties' summary judgment motions as follows: summary judgment is (1) **GRANTED** in favor of Plaintiffs as to their adequacy of notice claim; (2) both parties' motions are **GRANTED** in part and **DENIED** in part as to Plaintiff's claim related to the constitutionality of the *Joseph* hearing; and (3) **GRANTED** in favor of the Government as to Plaintiffs' contemporaneous verbatim records claim.  Finally, the Court **DENIES** Plaintiffs' motion to certify a class as necessary.

## BACKGROUND

The following facts are undisputed.  Gayle is a Jamaican national and legal permanent resident of the United States. Defs.' Resp. to Pls.' Stmt. of Mat'l Facts at ¶ 22. He has lived in the United States for approximately 30 years. *Id.* ¶ 23. According to documents filed by ICE, in May 1995, Gayle was convicted after a bench trial of criminal possession of a controlled substance with the intent to sell in the third degree under New York State Penal Law § 220.16. *Id.* ¶ 24. In March 2007, Gayle pleaded

guilty to a misdemeanor marijuana possession charge for which he was sentenced to ten days in jail. *Id.* ¶ 25. On March 24, 2012, ICE officers arrested Gayle. Pls.' Resp. to Defs.' Stmt. of Mat'l Facts at ¶ 3. ICE issued a Notice to Appear ("NTA"), charging Gayle with removal on the ground that his 1995 conviction rendered him deportable, and also found him subject to mandatory immigration detention based on his 2007 conviction.[4] Defs.' Resp. to Pls.' Stmt. of Mat'l Facts at ¶¶ 27-28.

On March 24, 2012, Gayle received a Form I-286 Notice of Initial Custody Determination. *Id.* ¶ 29. At the time of receipt, as its policy, ICE provided every detainee under § 1226(c) mandatory detention with a Form I-286 notifying him that he "shall be: detained in the custody of the Department of Homeland Security" and checked the second box regarding IJ review, which stated that he "may not request

---

[4]    The Government disputes Plaintiffs' characterization that "the [G]overnment placed Mr. Gayle in mandatory detention under § 1226(c) based on his 2007 marijuana conviction, although it did not charge him with deportability on this basis in his NTA." Defs.' Resp. to Pls.' Stmt. of Mat'l Facts ¶ 28. Rather, the Government claims that "ICE placed Mr. Gayle in mandatory detention based on a 2007 'drug conviction,'" *id.,* and thus claims that Gayle's deportation was also based upon his 2007 drug conviction.

While Gayle was detained and his removal proceedings were ongoing, he filed a habeas petition in this Court asserting that DHS lacked the statutory authority to detain him under § 1226(c), because the statute requires DHS to take an alien into custody immediately upon release from custody on his conviction. This Court granted Gayle's petition and ordered the Immigration Judge to provide Gayle with a bond hearing. Gayle was released on bond on March 25, 2013. The Government has not appealed this Court's March 15, 2013 Order, notwithstanding the Third Circuit's opinion in *Sylvain v. Atty. Gen. of the United States*, 714 F.3d 150 (3d Cir. 2013), rejecting the argument that Section 1226(c) only allows for mandatory detention if DHS takes the alien into custody immediately upon release. Gayle was granted release on $6,500 bond on March 22, 2013. Defs.' Resp. to Pls.' Stmt. of Mat'l Facts ¶ 39.

review of this determination by an immigration judge ["IJ"] because the Immigration and Nationality Act prohibits your release from custody" ("Second Box"). *Id.* ¶ 30. However, the second box was not checked on the Form I-286 served on Gayle; instead, ICE checked the first box on Gayle's Form I-286, indicating that he "may request" that an IJ re-determine ICE's custody decision ("First Box").[5] *Id.* ¶ 31. Gayle checked the box located on the bottom of the form indicating that he requested a custody redetermination hearing by an IJ. *See* Gayle I-286 Form. On April 10, 2012 and June 13, 2012, proceedings were held in front of IJ Alan L. Page. Pls.' Resp. to Defs.' Stmt. of Mat'l Facts at ¶ 9. At the June 13th hearing, IJ Page advised Gayle that ICE had documents establishing that Gayle had been convicted of a controlled substance offense in 2007, and that Gayle needed to present disposition documents showing the substance of the 2007 conviction. *Id.* ¶¶ 10-11. Neither of the two hearings, however, constituted a custody redetermination hearing under *Joseph*—in fact, Gayle never received a *Joseph* hearing.[6] Defs.' Resp. to Pls.' Stmt. of Mat'l Facts at ¶ 61. Further,

---

[5]    While Plaintiffs characterize ICE as having "incorrectly checked the first box on Mr. Gayle's Form," the Government disputes that characterization, asserting that "[w]hile ICE policy was to check a different box, it was not incorrect for ICE to have checked the box indicating that Mr. Gayle 'may request' custody redetermination by an immigration judge because aliens detained under 8 U.S.C. §1226(c) are entitled to such hearings–which are considered part of the 'bond hearings' continuum." (citing 8 C.F.R. §1003.19(h)(2)(ii); *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999); Weisel Tr. 73:9, 11-12).

[6]    Gayle characterizes the hearings in front of IJ Page as "*removal* hearings," whereas the Government asserts in its Stmt. of Mat'l Facts that IJ Page "reviewed the basis of ICE's custody decision." Pls.' Resp. to Defs.' Stmt. of Mat'l Facts ¶ 9. However, in the Government's response to Plaintiffs' Cross-Motion for Summary Judgment, the Government concedes that "Plaintiff's hearings under 8 C.F.R. § 1003.19(h)(2) . . . may have fallen short of the standards announced by the Board of

according to Gayle's Notice to Appear, Gayle's 2007 drug conviction was not a basis for his removal. *See* Gayle Notice to Appear.

On September 20, 2012, Gayle filed a Motion to Terminate removal proceedings based on the Government's failure to prove the existence of the alleged 1995 conviction, i.e., attempted drug sale. Defs.' Resp. to Pls.' Stmt. of Mat'l Facts at ¶ 35. The IJ denied the Motion to Terminate on October 23, 2012. *Id.* ¶ 36. Subsequently, Gayle was mandatorily detained for approximately twelve months at the Monmouth County Correctional Facility in Freehold, New Jersey. Defs.' Resp. to Pls.' Stmt. of Mat'l Facts at ¶ 33.

Sukhu is a Guyanese national and LPR of the United States, who has lived in this country for approximately 20 years, almost entirely in New York City. *Id.* ¶ 40. In June 1997, Sukhu pleaded guilty to assault in the second degree in violation of N.Y. Penal Law § 120.05(6) and was sentenced to 90 days imprisonment. *Id.* ¶ 41. In May 2011, Sukhu pleaded guilty to a misdemeanor offense of theft of services in violation of N.Y. Penal Law § 165.15 and was sentenced to time served. *Id.* ¶ 42; Pls.' Resp. to Defs.' Stmt. of Mat'l Facts at ¶ 20. On August 15, 2011, ICE officers arrested Sukhu, *Id.* ¶ 21, and on the same day, ICE issued a Notice to Appear, charging Sukhu with removal under 8 U.S.C. §1227(a)(2)(A)(i)—which governs crimes of moral

---

Immigration Appeals in *Matter of Joseph* . . . . Defendants changed their position because the transcripts of proceedings reflect that the immigration judge did not explicitly ask Plaintiff if he wished to challenge ICE's initial custody determination and on what basis." Defs.' Brief Opposing Pls.' Cross-Mot. for Summ. J. at 4. Accordingly, Gayle never received a *Joseph* hearing.

turpitude—based on his 1997 conviction. Defs.' Resp. to Pls.' Stmt. of Mat'l Facts at ¶ 44.

On August 15, 2011, Sukhu received a Form I-286 Notice of Initial Custody Determination. *See* Sukhu I-286 Form. ICE determined that Sukhu was subject to mandatory detention under § 1226(c) based on two different convictions, i.e., 1997 and 2011 convictions, for crimes of moral turpitude. Pls.' Resp. to Defs.' Stmt. of Mat'l Facts at ¶ 23. Similar to Gayle, Sukhu received a Form I-286 from ICE notifying him that he "shall be: detained in the custody of the Department of Homeland Security." Along with that notification, ICE checked the First Box on the Form, which like Gayle's Form, indicated that he "may request" that an IJ re-determine ICE's custody decision [7] *Id.* ¶ 49. Sukhu also checked the box located on bottom portion of the form which indicated that Sukhu requested a custody redetermination hearing by an IJ. *See* Sukhu I-286 Form.

Sukhu was subject to mandatory detention under § 1226(c) for nearly 21 months at the Monmouth County Correctional Facility in Freehold, New Jersey. Defs.' Resp. to Pls.' Stmt. of Mat'l Facts at ¶ 51. At no point during his detention did the IJ inform Sukhu of his right to a *Joseph* hearing to challenge his mandatory detention. *Id.* ¶ 52. As to a bond hearing, ICE did not take the position that Sukhu was a flight risk nor did Sukhu receive a bond hearing or any other individualized determination that he posed a danger to the community. *Id.* ¶ 53.

---

[7]     As with Gayle, the Government disputes Plaintiffs' characterization that ICE "incorrectly" checked the first box on Sukhu's Form. See *supra,* n.3.

On November 11, 2012, Sukhu, represented by counsel, attended a removal hearing before an IJ. On December 27, 2011, Sukhu sought to terminate his deportation proceeding on the basis that his assault conviction was not a crime of moral turpitude ("CIMT"), and thus, he was not deportable. *Id.* ¶ 54. Sukhu reasoned that the BIA decision, *Matter of Silva-Trevino*, 24 I&N Dec. 687 (AG 2008), which would categorize Sukhu's prior assault conviction as a CIMT should not be followed.[8] *Id.* ¶ 55. On March 7, 2012, the IJ rejected Sukhu's argument and found that *Silva-Trevino* mandated Sukhu's deportation based upon his assault conviction being a CIMT. *Id.* ¶ 57. On March 8, 2012, ICE filed an additional charge against Sukhu, charging him with removability under 8 U.S.C. § 1227(a)(2)(A)(ii)—two crimes of moral turpitude—based on the combination of his 1997 and 2011 convictions. *Id.* ¶ 45. On April 30, 2013, however, the IJ granted Sukhu's application for adjustment of status based on a relative petition filed by his U.S. citizen daughter, and thus, terminated his removal proceedings. *Id.* ¶ 58. On May 8, 2013, Sukhu was released from ICE custody. *Id.* ¶ 59. The Government did not appeal the IJ's ruling. *Id.* ¶ 60. Importantly, at no point during his detention did Sukhu receive a *Joseph* hearing. *Id.* ¶ 61.

---

[8]   At the time Sukhu's Motion to Terminate was pending, *Silva-Trevino* had been rejected by several Courts of Appeals, including the Third Circuit. However, two circuit courts of appeals have deferred to *Matter of Silva-Trevino*, and the matter has not yet been decided by the Second Circuit, the circuit in which Sukhu's Immigration Judge sat. *Id.* ¶ 56.

On August 5, 2013, Named Plaintiffs filed their third-amended class-action complaint ("TAC") against the Government, alleging, in relevant part, two causes of action for violations of the Immigration and Naturalization Act ("INA") and the due process clause of the United States Constitution.[9] On March 14, 2014, the Court ruled on the Government's motion to dismiss the TAC; the Court granted the Government's motion to dismiss Plaintiffs' claims for declaratory and injunctive relief in Counts One and Two of the TAC to the extent that Plaintiffs were requesting that a *Joseph* hearing be provided to any mandatorily detained alien who has a substantial challenge to his or her removal on grounds other than whether the alien falls within Section 1226(c) categories requiring mandatory detention.  *See Gayle v. Johnson*, 4 F. Supp. 3d 692 (D.N.J. 2014). The Court denied the Government's motion to dismiss Counts One and Two with respect to Gayle's and Sukhu's challenges to the constitutional and statutory adequacy of the procedures related to the *Joseph* hearing.  Based on those rulings, the following claims remain:  as to detainees who are mandatorily detained under Section 1226(c) by ICE, Plaintiffs assert that they, and other similarly situated individuals, must have the opportunity to receive a constitutionally adequate hearing before an immigration judge to make a determination on their mandatory detention.  To that end, Plaintiffs further assert that this hearing must be one that (1) includes adequate notice; (2) places the initial

---

[9]    The TAC also contains individual habeas claims consisting of four causes of action for an original named plaintiff, Sheldon Francois. The Court disposed of this claim in an Opinion and Order dated August 23, 2013. *See* Dkt. Nos. 80 & 81.

burden of establishing that an alien falls within Section 1226(c) on the Government; and (3) requires a contemporaneous record of proceedings.

Thereafter, the Government filed the instant motion to dismiss and, in the alternative, a motion for summary judgment. The Government contends that (1) Plaintiffs lack standing to challenge the adequacy of notice because they in fact received notice and further, the issue is moot, since ICE now uses updated I-286 forms in the District of New Jersey; (2) Plaintiffs lack standing to challenge the standards applied at *Joseph* hearings because they did not receive *Joseph* hearings;[10] (3) Plaintiffs lack standing to challenge the lack of a contemporaneous verbatim record of *Joseph* hearings because IJ Page recorded his custody redeterminations for Named Plaintiffs; (4) Plaintiffs lack standing to challenge the standards applied during *Joseph* hearings because they did not possess substantial challenges to the bases for their mandatory detention; (5) the Government already bears the initial burden at the custody redetermination hearing; (6) the Constitution does not require that custody redetermination hearings resemble pre-merits mini-trials; and (7) under 8 U.S.C. § 1252(f)(1), this Court is precluded from granting the requested class relief.

---

[10]    Initially, the Government argued that Named Plaintiffs received *Joseph* hearings and thus could not challenge the adequacy of notice for such hearings. Defs.' Mot. to Dismiss or in the Alt. for Summ. J., at 12. However, in response to Plaintiffs' cross-motion for summary judgment, the Government concedes that the removal proceedings in which Named Plaintiffs participated did not amount to custody redetermination hearings and instead argues that because Plaintiffs did not receive *Joseph* hearings, they "cannot establish that they were prejudiced by any deficiencies in the procedures applicable to *Joseph* hearings." Defs.' Resp. to Pls.' Cross-Mot. for Summ. J. at 10.

On July 1, 2014, Plaintiffs filed a cross-motion for summary judgment. Plaintiffs claim that (1) Plaintiffs have standing to challenge the adequacy of the *Joseph* hearing and its associated procedures because Plaintiffs did not receive notice of their right to a *Joseph* hearing, did not receive *Joseph* hearings, and each presented a substantial challenge to the Government's charges; (2) Plaintiffs' notice claims are not mooted by ICE's updated Form I-286; (3) the *Joseph* standard and associated procedures violate both the Constitution and the INA; and (5) 8 U.S.C. 1252(f)(1) does not preclude requested class-wide injunctive relief.

## DISCUSSION

### I.   Section 1226(c) and *Matter of Joseph*

In this Court's March 14, 2014 Opinion, I set forth the statutory and regulatory framework related to mandatory immigration detention and I incorporate that Opinion's relevant discussion herein. *See Gayle*, 4 F.Supp.3d at 701-05. However, for the purposes of this motion, I briefly note that 8 U.S.C. § 1226(c), enacted in the 1990s, concerns the apprehension and detention of aliens, and during the pendency of their removal cases, imposes mandatory detention on individuals, who are "deportable" or "inadmissible" based on certain criminal convictions.  It states,

> The Attorney General shall take into custody any alien who—
> (A) is inadmissible by reason of having committed any offense covered in section 1182 (a)(2) of this title,
> (B) is deportable by reason of having committed any offense covered in section 1227 (a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence to a term of imprisonment of at least 1 year, or
> (D) is inadmissible under section 1182 (a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

11

> when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.[11]

8 U.S.C. § 1226(c); *compare* 8 U.S.C. § 1226(a) (allowing aliens discretionarily detained pursuant to that provision to obtain an individualized bond hearing). According to the Government, ICE makes the initial determination that an individual is removable on the ground triggering mandatory detention under Section 1226(c) under a "reason to believe" standard. 8 U.S.C. § 1357(a)(2). Then, an alien could challenge that determination pursuant to the BIA decision in *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999). There, the Board held that an alien whom the INS[12]

---

[11]    Specifically, § 1226(c) applies to aliens who are deportable on account of: having been convicted of two or more crimes involving moral turpitude, an aggravated felony, a controlled substance offense, certain firearm-related offenses, or certain other miscellaneous crimes, or having committed a crime of moral turpitude within a certain amount of time since their date of admission for which a sentence of one year or longer has been imposed; and finally, aliens who are inadmissible or deportable because of connections to terrorism. *See* 8 U.S.C. § 1226(c) (referencing *id.* § 1182(a)(2), § 1227(a)(2)(A)(ii), § 1227(a)(2)(A)(iii), § 1227(a)(2)(C), § 1227(a)(2)(C), § 1227(a)(2)(D), § 1227(a)(2)(A)(i), § 1182(a)(3)(B), § 1227(a)(2)(C), § 1227(a)(4)(B)). The sole statutory exception to mandatory detention is if the Attorney General determines that the alien should be part of the federal witness protection program. 8 U.S.C. § 1226(c)(2).

[12]    INS is the predecessor to DHS/ICE. *Khouzam v. Attorney Gen. of United States*, 549 F.3d 235, 243 n. 7 (3d Cir. 2008) ("The Homeland Security Act of 2002 ... eliminated the Immigration and Naturalization Service ('INS') and assigned INS's enforcement functions to the DHS's Bureau of [ICE]. . . ."). As part of the Homeland Security Act of 2002, the functions of the INS were transferred from the Department of Justice to three different agencies under the newly formed DHS: ICE, Customs and Border Protection, and Citizenship and Immigration Services, with ICE assuming the majority of the INS's immigration enforcement function. *Lin–Zheng v. Attorney. Gen.*, 557 F.3d 147, 152 n. 4 (3d Cir. 2009) (citing Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135).

determined was subject to mandatory detention could request a hearing to prove that INS "is substantially unlikely to establish at the merits hearing, or on appeal, the charge or charges that would otherwise subject the alien to mandatory detention."[13] 22 I. & N. Dec. 799 (BIA 1999).

The *Joseph* Board reasoned that the foregoing standard would give both (1) "significant weight" to INS's initial custody determination in line with congressional intent that certain categories of removable aliens should be mandatorily detained, and (2) "genuine life" to the regulation that allows the IJ to reexamine the INS's determination. *Id.* at 807.  In that regard, the BIA instructed the IJ to "look forward to what is likely to be shown during the hearing on the underlying removal case." *Id.* In other words, in order to support its "reason to believe" obligation at a preliminary hearing, the INS would not necessarily be required to provide, for example, a certified copy of the alien's conviction that served as the basis for mandatory detention, even though such a document ordinarily would be necessary for the Government to meet its burden of demonstrating that the alien should be removed. *See id.*  Indeed, the Board made clear that the standard of proof on the Government is less exacting as the one imposed for the merits hearing.

Consequently, ICE devised certain procedures for executing the provisions of Section 1226 consistent with *Matter of Joseph*. Individuals who are subject to

---

[13]   The BIA has also stated that *Joseph* requires an individual to demonstrate that ICE is "substantially unlikely to establish that the [individual's] convictions would support a [mandatory detention] charge." *Matter of Kotliar*, 24 I. & N. Dec. 124, 127 (BIA 2007).

discretionary detention under Section 1226(a) or mandatory detention under Section 1226(c) are issued a notice of custody determination, i.e., Form I-286.  Form I-286, revised in March 2014, simply informs the alien that, "[p]ending final administrative detention in your case, you will be:" either "[d]etained by the Department of Homeland Security" or "[r]eleased under certain conditions"; it also informs aliens that they "may request a review of this custody determination by an immigration judge." Simao Decl. ¶ 9; Rev. Form I-286. The manner in which the review is carried out follows: If an individual is deemed mandatorily detained, his or her requested review will be a hearing before an IJ on whether he or she is "properly included" under Section 1226(c)—the hearing contemplated in *Joseph*. 8 C.F.R. 1003.19(h)(2)(ii); *see also* Defs.' Resp. to Pls.' Stmt. Of Mat'l Facts at ¶ 2. If the individual is successful in proving that he or she is not "properly included" under Section 1226(c), by establishing that ICE is "substantially unlikely" to prevail on the charges that trigger mandatory detention, the individual then proceeds to an individualized bond hearing—the same type of custody hearing accorded to those discretionarily detained pursuant to Section 1226(a). *See Demore v. Kim*, 538 U.S. 510, 532 (2003).

Relatedly, *Joseph* hearings are not contemporaneously recorded verbatim as a matter of policy; rather, *Joseph* hearings are normally summarized by the IJ's order determining that a noncitizen is subject to mandatory detention or is eligible for a bond hearing. Defs.' Resp. to Pls.' Stmt. Of Mat'l Facts at ¶ 18. However, when a party

appeals a *Joseph* decision, the IJ drafts a short bond memorandum providing the reasons for his or her decision in that context. *Id.*

## II.    Standard of Review

### a.  Motion for Summary Judgment

Courts will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52. A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *See id.* at 252. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts "in the light most favorable to the [non-moving] party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party then carries the burden to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. Moreover, the non-moving party may not rest upon the mere allegations or denials of its pleading. *Id.* at 324; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994).

The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A mere "scintilla of evidence . . . will be insufficient." *Anderson*, 477 U.S. at 252.

### b. Standing

To satisfy the "case or controversy" standing requirement under Article III, a plaintiff must establish that he or she has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action. To satisfy this requirement, a "litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474-75 (1982); *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 538 (3d Cir. 1994).

Constitutional standing requires an "injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011). It is insufficient for the plaintiff to merely raise a "generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992). Thus, in challenging the application of a federal statute—as Plaintiffs do here—the challengers must show

that they have already sustained, or are in immediate and certain danger of sustaining, a real and direct injury. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).

    *c. Procedural Due Process*

    "Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment . . . . The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

    "The due process afforded aliens stems from those statutory rights granted by Congress and the principle that minimum due process rights attach to statutory rights." *Dia v. Ashcroft*, 353 F.3d 228, 239 (3d Cir. 2003) (internal citation and quotation marks omitted). Although an alien's mandatory detention for a reasonable period pending removal is constitutional, "the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Demore*, 528 U.S. at 523 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Thus, even in circumstances where mandatory detention is constitutionally permissible, due process still requires "adequate procedural protections" to ensure that the Government's stated justification for detaining an alien without a bond hearing "outweighs the individually

constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690 (internal quotation marks omitted).

## III.   Adequacy of Notice

I first address the Government's standing challenge in the context of the adequacy of notice given to aliens.   The Government maintains that Plaintiffs' adequacy of notice claim fails because (1) Plaintiffs received actual notice of their right to a custody redetermination hearing and thus, lack standing; and (2) the claim is now moot because beginning in December 2013, ICE agents began checking the box on Form I-286 informing aliens that they have a right to seek review of ICE's custody determination in front of an IJ, and moreover, in March 2014, ICE adopted a revised Form I-286 that informs all aliens of their right to a custody redetermination hearing. Simao Decl. ¶¶ 8-9.   In response, Plaintiffs contend that the Court has already disposed of the Government's standing challenge in this context in its previous decision, and that the revised Form I-286 continues to be constitutionally infirm.

The initial inquiry is whether Named Plaintiffs have standing; Named Plaintiffs must have suffered an injury-in-fact as a result of their allegedly inadequate notice of a custody redetermination hearing. *See Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (holding that the "initial inquiry" into standing in a putative class action is "whether the lead plaintiff individually has standing, not whether or not other class members have standing"); *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("Nor does a plaintiff who has been subject to injurious

conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.").

The Government argues that because ICE checked the first box on Named Plaintiffs' Forms I-286 -- which indicated that a detainee "may request" that an IJ re-determine ICE's custody decision -- Named Plaintiffs indeed received notice of their rights to a custody redetermination hearing. Plaintiffs counter that (1) the checked box merely represented notice of a bond hearing, as opposed to a *Joseph* hearing,[14] and (2) even if the checked box informed each Named Plaintiff of his right to a *Joseph* hearing, the notice still fell short of what due process requires, because the form did not specifically explain the nature of a *Joseph* hearing—that Named Plaintiffs were entitled to a hearing in which an IJ determines whether Named Plaintiffs were properly included under Section 1226(c).  Furthermore, Named Plaintiffs never received their requested hearings.

Indeed, the Form I-286 that Named Plaintiffs received stated that "[p]ursuant to the authority contained in Section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations," DHS determined that "pending a final determination by the immigration judge in your case, and in the event you are

---

[14]     *Joseph* hearings differ from bond hearings in that at a *Joseph* hearing, the operative question is whether the alien is properly included under Section 1226(c)— whereas the outcome of a bond hearing turns on whether the criminal defendant is a flight risk or a danger to the community.  Aliens detained under Section 1226(a) are entitled to a bond hearing, whereas those detained under Section 1226(c) are subject to mandatory detention and not accorded a bond hearing, with a limited exception for those subject to the witness protection program. 8 U.S.C. § 1226(a), (c); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 230, 232 (3d Cir. 2011).

ordered removed from the United States, until you are taken into custody for removal you shall be: detained in the custody of the Department of Homeland Security." Sukhu Form I-286; Gayle Form I-286. DHS/ICE checked the First Box on the form, indicating that Plaintiffs "may request a review of this determination by an immigration judge." Sukhu Form I-286; Form Gayle I-286. Named Plaintiffs checked the boxes on the form indicating that they did request a hearing before an immigration judge and that they acknowledged receipt of this notification. Sukhu Form I-286; Gayle Form I-286.

Based on the plain language of the form, I find that Named Plaintiffs did not receive notice of their right to a *Joseph* hearing and thus, have standing to challenge the adequacy of that notice. ICE has stated that its policy at the time that Gayle and Sukhu were detained was to check the Second Box for those detained pursuant to Section 1226(c), and thus subject to mandatory detention. Simao Dep. at 110; Defs.' Response to Pls.' Stmt. Of Mat'l Facts at ¶¶ 30, 48.  Importantly, there were no boxes to check, or any language, on the form that notified a mandatorily detained alien that he/she was entitled to a *Joseph* hearing. Conversely, those who were issued notices of custody determinations pursuant to Section 1226(a) were entitled to an individualized bond determination as a matter of right. *See* 8 U.S.C. § 1226; *see also* Simao Dep. at 107.  It appears that ICE's policy at the time of Gayle's and Sukhu's detentions was to check the First Box for only those discretionarily detained under Section 1226(a) so as to accord such individuals their right to an individualized bond hearing. *See id.* § 1226(a); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 230 (3d Cir.

2011). Both Gayle and Sukhu were detained pursuant to Section 1226(c). Defs.' Response to Pls.' Stmt. Of Mat'l Facts at ¶¶ 28, 47. It follows that ICE's apparent mistake by checking the First Box on Named Plaintiffs' Form I-286s was not intended to provide notice of Named Plaintiffs' rights under *Joseph*, as suggested, *post facto*, by the Government. In fact, under the language of the old Form I-286, Named Plaintiffs were never apprised of their right to receive a *Joseph* hearing, let alone to request one. Therefore, Named Plaintiffs clearly did not receive notice of their right to a *Joseph* hearing, and thus have suffered an injury-in-fact sufficient to confer standing to challenge the adequacy of the Form I-286.[15]

The Government alternatively argues that Plaintiffs' adequacy of notice claim is now moot because of the recent changes ICE made to Form I-286. According to the Government, the form now informs *all* detained aliens of their right to a custody redetermination hearing in front of an IJ. *See* Rev. Form I-286. However, Plaintiffs argue that summary judgment in their favor is still warranted because ICE's changes to Form I-286 remain constitutionally infirm. At issue here is whether the amended Form I-286 contains adequate information to apprise a detainee of his/her rights under the law.

To comport with due process requirements, deprivations of life, liberty or property should "be preceded by notice and an opportunity for hearing appropriate to

---

[15]   I further note that I have previously found that Gayle and Sukhu have standing to challenge procedures related to the *Joseph* hearing. While the Government advances additional arguments here in support of its position, my reasons regarding standing provided in the March 14, 2014 Opinion are equally applicable on this motion. *See Gayle*, 4 F. Supp. 3d at 713-14.

the nature of the case." *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 313 (1950). In general, notice must be "reasonably calculated to apprise interested parties of the pendency of the action," *id.* at 314, so that they can adequately prepare for the hearing. *See Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 14 (1978). Notice must inform the individual whose protected interests are at risk of the opportunity to present objections at "some kind of hearing" before the final deprivation of those interests. *Wolff v. McDonnell*, 418 U.S. 539, 577–78 (1974).

Here, revised Form I-286, entitled "Notice of Custody Determination," informs recipients in the first section that, "[p]ursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, [DHS has] determined that, pending a final administrative determination," they are either detained or released. *See* Rev. Form I-286.  In the second section, detainees are informed that they "may request a review of this custody determination by an immigration judge" and must check the boxes stating that they acknowledge receipt of this notification and that they either request or do not request "an immigration judge review of this custody determination." *Id.* Section 236 of the INA corresponds to 8 U.S.C. § 1226.[16]

---

[16]     INA: ACT 236 - APPREHENSION AND DETENTION OF ALIENS, U.S. CITIZENSHIP                AND                IMMIGRATION                SERVS., http://www.uscis.gov/iframe/ilink/docView/SLB/HTML/SLB/0-0-0-1/0-0-0-29/0-0-0-5570.html (last accessed Nov. 24, 2014).

Having reviewed its content, I find that, as a matter of law, revised Form I-286 does not provide adequate notice of an alien's right to a custody redetermination hearing, and therefore, the revised form is constitutionally infirm.  First, the revised form expressly informs all aliens subject to detention under Section 1226—whether under Section 1226(a) or Section 1226(c)—to request a hearing on ICE's custody determination, without regard to the alien's status.  *See* Shanahan Decl. at 2. However, Form I-286 not only fails to provide an alien with explicit notice that he or she is deemed subject to mandatory detention pursuant to Section 1226(c), but the Government also concedes that no other notice of mandatory detention is given to that alien.  *See* Simao Tr. 142:9-17 ("Q: [D]oes ICE provide an alien subject to mandatory detention with any notice other than the I-286? . . . A: No other notice.").[17] It is not disputed that those subject to Section 1226(a) detention may receive an individualized bond determination, in which an immigration judge determines whether the alien is a flight risk or a danger to the community. 8 C.F.R. § 236.1(c)(8);

---

[17]    While the alien's NTA provides information about the basis for ICE's decision to seek removal, the NTA's charges are not necessarily exhaustive. For example, Gayle was placed in mandatory detention under § 1226(c) based on a 2007 drug conviction, though ICE did not charge him with deportability on this basis in his NTA. *See* Defs.' Resp. to Pls.' Stmt. Of Mat'l Facts at ¶ 28; Gayle's NTA. The BIA has held that "where the basis for detention is not included in the charging document, the alien must be given notice of the circumstances or convictions that provide the basis for mandatory detention and an opportunity to challenge the detention before the Immigration Judge during the bond redetermination hearing." *In Re Kotliar*, 24 I. & N. Dec. 124, 127 (BIA 2007). Still, even if the NTA contains the charges that may trigger mandatory detention, it does not actually state whether ICE has deemed the individual subject to mandatory detention under Section 1226(c).  Simply put, the NTA does not, even when read together with the revised Form I-286, adequately apprises aliens of their rights.

*Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150, 154 (3d Cir. 2013). On the other hand, an alien detained under Section 1226(c) may request a *Joseph* hearing, wherein the alien must prove that he or she is not properly included under Section 1226(c). It is beyond dispute that the two hearings are procedurally distinct and involve different evidentiary burdens; indeed, only if an alien is successful at a *Joseph* hearing does he or she then proceed to receive an individualized bond determination. *See Demore*, 538 U.S. at 532. The failure of Form I-286 to differentiate between the basis for detention, i.e., whether it is section 1226(a) or Section 1226(c), and what type of hearing is permitted, i.e., a *Joseph* hearing or bond hearing, results in inadequate notice to the alien regarding his or her rights to a hearing and the type of hearing to which he or she is entitled.

Indeed, this sort of omission does not comport with procedural due process requirements. It is a fundamental requirement of due process "in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314; *West v. Spencer*, 321 Fed. Appx. 151, 153 (3d Cir. 2009); *Nu-Look Design, Inc. v. C.I.R.*, 356 F.3d 290, 295 (3d Cir. 2004). Significantly, "[t]he notice must be of such nature as reasonably to convey the required information." *In re Penn Cent. Transp. Co.*, 771 F.2d 762, 768 (3d Cir. 1985). Thus, the purpose of the notice requirement is to advise individuals who will be affected by the outcome of any proceeding of the impending hearing so that they can take steps to safeguard their interests. *Memphis Light Gas*,

24

436 U.S. at 14; *Greene v. Lindsey*, 456 U.S. 444, 451 (1982). Here, the omission is significant because if an alien is not apprised of his or her detention status, it follows that the alien would not know, and the form fails to indicate, the type of custody redetermination hearing to which he or she is entitled. In that regard, the notice does not adequately convey the necessary information such that the alien could properly prepare for either the *Joseph* hearing or a bond hearing, particularly since the hearings require different types of proofs and the alien has a significantly higher burden of proof at a *Joseph* hearing, *see infra*.

Accordingly, I find that ICE's revised Form I-286 does not provide adequate notice to aliens detained pursuant to Section 1226(c) of their right to contest their detention and thus, I grant summary judgment in favor of Plaintiffs on their adequacy of notice claim.

## IV. Constitutionality of the *Joseph* Hearing

### a. Justiciability

The Government argues that Plaintiffs lack standing to challenge the *Joseph* hearing procedures. In its brief, the Government argues that Plaintiffs lack standing because they did not possess substantial challenges to the bases for their mandatory detention.[18] In support of its argument, the Government claims that (1) Plaintiffs have not set out a definition of "substantial," (2) Gayle's motion to terminate merely

---

[18]    As explained *supra*, the Government, having conceded that Plaintiffs did not receive *Joseph* hearings, abandoned its initial argument that Plaintiffs lack standing to challenge the adequacy of the *Joseph* hearing and its associated procedures because they received *Joseph* hearings; accordingly, the Court will not analyze this argument.

claimed that ICE did not properly document the 1995 conviction charged in his Notice to Appear, which the court denied based on "binding case law" and (3) Sukhu's challenge cannot qualify as substantial because the case law upon which his challenge rests—the broad rejection of *Silva-Trevino*—has not been universally confirmed. Plaintiffs, on the other hand, argue that (1) the test for determining whether they possess a "substantial challenge" to their detention is the test used by the Third Circuit to determine the standards applicable to the Bail Reform Act of 1984, (2) the Government failed over several months to provide documentation proving the existence of Gayle's charged conviction, rendering Gayle's argument legitimate, and (3) because the Third Circuit agrees with Sukhu's reading of *Silva-Trevino* as do a majority of the circuits that have considered this issue, Sukhu has at least raised a "substantial" question about whether he was properly subject to Section 1226(c).

In essence, the issues raised by the parties in this context relate to the respective merits of Gayle and Sukhu's deportability, i.e., whether Gayle and Sukhu each has a substantial basis to terminate removal proceedings. Thus, the question relating to the definition of "substantial challenge," a term advanced by Plaintiffs, is not one that impacts standing. Indeed, the Government improperly injects one of its arguments opposing Plaintiffs' class certification motion[19] into its motion for

---

[19]    In its opposition to Plaintiffs' class certification motion, the Government claims that Plaintiffs lack standing to bring the class action defined by Plaintiffs because their challenges to threshold deportability are not substantial; thus, "Plaintiffs are not part of the class they seek to represent." Defs.' Opp. Br. to Pls.' Renewed Mot. for Class Cert., Docket. No. 101 at 10.

summary judgment.  Rather, the Court has already addressed the standing issue in its March 14, 2014 Opinion.  I found that both Gayle and Sukhu had sufficiently alleged injury and, thus, standing to challenge the *Joseph* hearing and associated procedures because (1) Gayle "had a basis for challenging his inclusion under Section 1226, which he did not waive or otherwise concede" and (2) Sukhu "had a substantial argument for termination of his removal proceedings on the basis that his assault conviction is not a crime involving moral turpitude," which "is a basis for Sukhu to challenge, in a *Joseph* hearing, his inclusion under Section 1226(c) and [both Plaintiffs] were thus eligible to receive a *Joseph* hearing." *See Gayle*, 4 F.Supp. 3d at 714-15.

Although the Government argues that Named Plaintiffs lack standing because they purport to bring a class action on behalf of those who possess a "substantial challenge" to their inclusion under Section 1226(c), and Named Plaintiffs do not have "substantial challenges" to their own inclusion under that statutory provision, I nonetheless find that my previous ruling on this issue remains the law of the case here.[20]  Whether Named Plaintiffs are appropriate representatives of a putative class does not impact the Court's decision that Named Plaintiffs have standing to bring

---

[20]    The law of the case "doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009). "[A]s a rule courts should be loathe to [revisit prior decisions] in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice." *Id.* (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)).

their own claims.  Moreover, the Government has submitted no additional facts on this motion that would alter the Court's prior determination on Plaintiffs' standing; Plaintiffs have standing to challenge the adequacy of the *Joseph* hearing and its attendant procedures.

Finally, as a part of its standing arguments, the Government submits that because Plaintiffs never had *Joseph* hearings, the Court lacks "a specific example of an immigration judge applying the standards articulated in *Joseph* to a plaintiff's challenges to removal and should thus "dismiss Plaintiffs' challenge to *Joseph* standards as unripe."[21] Defs.' Reply Br. at 8.  This argument has been addressed in my March 14th Opinion:

> I do not find it determinative for standing purposes, as the Government suggests, that neither Gayle nor Sukhu ever received a *Joseph* hearing. In order for Gayle and Sukhu to have standing, it is not necessary that they obtained a *Joseph* hearing because, based on the facts as [pleaded], both Gayle and Sukhu were entitled to such a hearing—irrespective of whether such a hearing would have been nothing more than an exercise in futility . . . .

*Gayle*, 4 F. Supp. 3d at 715.  Furthermore, discovery has taken place in this case;

---

[21]   "It is usually improper for a moving party to shift gears and introduce new legal arguments in the reply brief." *Stockroom, Inc. v. Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 543 (D.N.J. 2013) (citing *Laborers' Int'l Union of N. Am., AFL–CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir.1994) ("An issue is waived unless a party raises it in its opening brief"). However, I will consider the argument because Plaintiffs are not prejudiced by my doing so and because the Government, in its opposition brief, gave some notice of its intention to raise the issue of ripeness in its reply. Defs.' Reply at 1 n.1 ("Defendants will reply to Plaintiffs' opposition in a reply to be filed on August 5, 2014. At that time, Defendants will address more fully Plaintiffs' lack of standing and their claims' lack of ripeness.") (internal citation omitted).

contrary to the Government's assertion, Judge Wiesel's testimony during his deposition provides explanation, and specific instances, of how immigration judges apply the *Joseph* standards.

In sum, the Government does not offer any explanation for why the Court should revisit its prior holding. As such, its ripeness argument is unavailing and I deny the Government's motion for summary judgment on this basis. Accordingly, consistent with my prior ruling, both Gayle and Sukhu have standing to challenge the *Joseph* hearing procedures.

> b. *Due Process*[22]

---

[22] One of the aspects of Plaintiffs' challenge to the *Joseph* hearing procedures concerns the burden of proof. Plaintiffs advance that as a matter of constitutional protection of liberty interests, the Government should bear the initial burden at a Joseph hearing. Based on that position, the Government argues that Plaintiffs' claims regarding the *Joseph* hearing standards should be dismissed because ICE, in fact, has the initial burden to prove that it had a "reason to believe that the alien . . . is in the United States in violation of any [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest" before arresting an alien and issuing an NTA charging the alien with removability. *See* 8 U.S.C. § 1357(a)(2). However, like the Government's justiciability arguments on Plaintiffs' *Joseph* standards claim, this particular issue was already raised and addressed by this Court. In the Government's prior motion to dismiss, the Government argued that it "necessarily must first make a decision that all detainees are deportable (or inadmissible) in order to detain them under [S]ection 1226, even if they concede their deportability." Defs.' Br. In Support of First Mot. to Dismiss, Docket No. 75, at 18 (quoting *Gonzalez v. O'Connell*, 355 F.3d 1010, 1015 (7th Cir. 2004) (emphasis in original)). In my March 14th opinion, I distinguished between the "reason to believe" standard ICE initially employs in issuing NTAs and the burdens of proof at a *Joseph* hearing and found that

> Plaintiffs have alleged, which . . . this Court accepts as true on this motion and is also in line with the language of *Joseph*, that in order to show that mandatory detention is proper at the *Joseph* stage, the Government does not even have to produce a certified record of the alien's predicate criminal convictions. . . . Not requiring such a de

Both Plaintiffs and the Government move for summary judgment on Plaintiffs' claim that *Joseph* hearings do not satisfy due process because the burden of proof on aliens during such hearings is unconstitutionally burdensome.  On this issue, the Government reasons that while the *Joseph* standard -- which requires an alien to show that ICE is "substantially unlikely" to prove the charges through which mandatory detention is triggered -- may be high, it is not constitutionally impermissible because the standard satisfies the *Mathews* test.[23]  While Plaintiffs agree that I should apply the *Mathews* test when determining whether the procedures related to a *Joseph* hearing are constitutionally adequate, nonetheless, Plaintiffs contend that the Government's application of the *Mathews* test is erroneous because the Government (1) fails to account for the gravity of the private interest in freedom from imprisonment or the substantial risk that an individual would be

---

minimis burden of production be placed on the Government to show its 'reason to believe' that the alien is included under Section 1226(c), when combined with the high burden placed on the alien to show that the Government is 'substantially unlikely' to prove its case, further makes it plausible that the alien's ability to challenge his or her mandatory detention is all but illusory.

*Gayle*, 4 Supp.3d at 718 (internal citations omitted).  The Government seeks to re-litigate its prior motion to dismiss without any explanation warranting reconsideration of my March 14th opinion and order addressing the argument in question. Accordingly, I reject the Government's argument based on who carries the initial burden of proof at a *Joseph* hearing as a basis for dismissal of this claim.  More importantly, as explained below, I find ICE's initial burden at the *Joseph* hearing before an IJ is constitutionally infirm.

[23]    In *Mathews*, the Supreme Court devised a three-part test to determine whether an administrative procedure comports with due process. 424 U.S. at 333; *see infra*.

improperly subjected to mandatory detention under Section 1226(c); and (2) fails to establish that a change in the standard would impose a discernable burden on the Government.

In assessing whether a particular administrative procedure comports with due process, courts should "look to see if the process at issue fits with the notion that "[t]he *fundamental requirement of due process* is the opportunity to be heard at a meaningful time and in a meaningful manner." *Dia*, 353 F.3d at 239 (quoting *Mathews,* 424 U.S. at 333). "(D)ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

> In *Mathews,* the Supreme Court held that the "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009) (quoting *Mathews*, 424 U.S. at 335).

I note at the outset that whether the *Joseph* standards are constitutionally adequate is an open question.  *See Demore*, 538 U.S. at 514 n.3 ("[W]e have no occasion to review the adequacy of *Joseph* hearings generally in screening out those who are improperly detained pursuant to 1226(c)."); *Diop*, 656 F.3d at 231 n.8 ("[B]ecause the parties do not question the constitutional adequacy of a *Joseph*

hearing, we decline to address it here. We note, however, that the issue is an open one . . . .").[24]

Because the *Mathews* test is flexible, precedent has not established a uniform approach to which this Court must adhere. Rather, it is this Court's role to address each factor of the test and, if necessary, weigh them in fashioning a proper remedy. Thus, a court's first task is to identify and discuss each of the factors before weighing them. I begin my analysis under *Mathews* by examining whether Plaintiffs have identified a private interest that is affected by the Government's action. There is no dispute that: Plaintiffs have identified a private liberty interest, i.e., remain free from detention; that the Government's mandatory detention procedures affect this interest; and that a liberty interest may not be impaired without due process of law. *See Demore*, 538 U.S. at 523 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."). However, the parties dispute how much weight should be given to this factor in the flexible *Mathews* analysis. Plaintiffs argue that under *Zadvydas*, an alien's interest in freedom from detention "lies at the heart of the liberty that Clause protects," and that the Government must prove a "special justification" outweighing the "individual's

---

[24]    As I noted in my March 14th opinion, at least one Court of Appeals judge, sitting in the Ninth Circuit, has raised questions whether *Joseph* provides an adequate constitutional safeguard for those aliens who wish to challenge the Government's determination that they should be subject to mandatory detention. *See Tijani v. Willis*, 430 F.3d 1241, 1244 (9th Cir. 2005) (Tashima, J., concurring) ("The BIA's Joseph decision was, plainly put, wrong . . . . [Joseph] establishes a system of 'detention by default' by placing the burden fully on the alien to prove that he should not be detained.").

constitutionally protected interest in avoiding physical restraint." 533 U.S. at 690. The Government, however, points to language in *Demore* and other cases that "[t]he liberty rights of the aliens before us here are subject to limitations and conditions not applicable to citizens," *Demore*, 538 U.S. at 522 (internal quotations and citations omitted).

Essentially, the tension here is between Plaintiffs' liberty interest and the Government's authority, granted by Congress, to mandatorily detain deportable aliens who have committed certain crimes. The Government's position relies heavily on the third factor of the *Mathews* test -- the Government's interests and burdens. On this factor, the Government identifies certain interests that it argues weigh heavily in favor of maintaining the current *Joseph* standard. First, the Government submits that the *Joseph* standard protects the congressional aim of preventing deportable aliens from fleeing the country before their removal proceedings. This interest, indeed, coincides with Congress's stated intent in enacting § 1226(c). Section 1226(c) aims:

> (1) to protect the public from potentially dangerous criminal aliens; (2) to prevent aliens from absconding during removal procedures; (3) to correct former bond procedures under which over twenty percent of criminal aliens absconded before their deportation hearings; and (4) to restore public faith in the immigration system.

*Dean v. Ashcroft*, 176 F.Supp.3d 316 (D.N.J. 2001) (citing S. Rep. No. 104-48, 1995 WL 170285, at *1-6, 9 (1995)), *abrogated on other grounds by Demore*, 538 U.S. at 531.

These interests have been considered compelling by the Supreme Court, which found that § 1226(c) is premised on a sufficiently strong special justification so as not to run afoul of the Constitution. *See Demore*, 538 U.S. at 518-21.  In so finding, the Court stressed that mandatory detention

> necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed . . . . Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully.

*Id.* at 529.  Similarly, the Third Circuit recently reiterated that "Congress adopted the mandatory-detention statute against a backdrop of rising crime by deportable aliens . . . . To make matters worse, many aliens failed to show up at their deportation proceedings . . . . [Section 1226(c)] promotes the public interest by keeping the most dangerous aliens off the streets." *Sylvain,* 714 F.3d at 159.  As the Supreme Court observed in *Demore*, deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character." *Demore*, 538 U.S. at 523 (quoting *Wong Wing v. United States,* 163 U.S. 228, 235 (1896)) (quotation marks omitted).

Second, the current standard preserves the distinction between preliminary or custody hearings and merits hearings, a distinction clearly warranted for procedural and practical reasons. *See, e.g.*, *United States v. Delker*, 757 F.2d 1390, 1396 (3d Cir. 1985) ("Congress [has] warned that bail hearings should not become mini-trials.") (citations omitted); *Kaley v. United States*, 134 S.Ct 1090 (2014) ("[T]he Government

34

has a substantial interest in freezing potentially forfeitable assets without an evidentiary hearing about the probable cause underlying criminal charges. At the least, such an adversarial proceeding—think of it as a pre-trial mini-trial (or maybe a pre-trial not-so-mini-trial)—could consume significant prosecutorial time and resources."). To impose a more searching analysis in custody redetermination hearings, such as Plaintiffs' proposed "substantial challenge" standard, would, as argued by the Government, expend more governmental resources and further delay the ultimate disposition of an alien's removal proceedings. As a result, *Joseph* hearings would become more time consuming and complex.

I finally turn to the second *Mathews* factor, the risk of an erroneous deprivation and the probable value of additional procedural safeguards. *Mathews*, 424 U.S. at 335. Plaintiffs contend that under *Joseph*, the risk of erroneous deprivations of aliens' liberty interests is impermissibly high. Plaintiffs cite to a panoply of BIA cases which found that aliens had failed to establish under *Joseph* that ICE was "substantially unlikely" to prevail on its charges, despite asserting, among other claims, (1) U.S. citizenship,[25] (2) a circuit split or even unpublished case

---

[25]    *See, e.g., In re Romeo Ramirez-Garcia*, 2007 WL 1153825 (BIA Apr. 5, 2007) (rejecting a *Joseph* challenge because evidence that the detainee was a U.S. citizen was "inconclusive"). The Ninth Circuit eventually determined that the individual was a citizen. *See Ramirez-Garcia v. Holder*, 550 Fed. Appx. 501 (9th Cir. 2013). In the meantime, the citizen had been subjected to nearly two and a half years of mandatory detention until his eventual release on an order of supervision. *See Ramirez-Garcia v. Keisler*, No. 07-1902, 2009 WL 111512, at *2 (D. Ariz. Jan. 15, 2009).

law from within the circuit casting doubt on the alien's removability,[26] and (3) conviction under a divisible statute, which contains only some provisions constituting a basis for removal.[27]   Because *Joseph* essentially mandates detention unless ICE's charges are frivolous, and requires that the BIA resolve any doubt arising from incomplete evidence and unsettled law in favor of the Government, Plaintiffs argue that the *Joseph* standard "forces individuals facing detention to shoulder the entire risk of error." Pls.' Cross-Mot. at 28. Plaintiffs also cite to a deposition taken of the Honorable Robert Weisel, an assistant chief immigration judge of the United States, who admits that the *Joseph* hearing standard is "a very, very high standard . . . I don't know how high, but it's high." Weisel Tr. 90:18-22.   Tellingly, Judge Weisel refuses to state that ICE is required to produce at least some kind of documentary evidence to support its initial custody determination.[28] *See id.* at 109:22-24, 110.

---

[26]      *See, e.g., In re Garcia*, 2007 WL 46699861, at *1 (BIA Nov. 5, 2007) (explaining that "[a] legal argument that deportability will not be established is insufficient to meet the respondent's burden of proof in this matter in the absence of precedent case law directly on point that mandates a finding that the charge of removability will not be sustained."); *In re Flores-Lopez*, 2008 WL 762690 (BIA Mar. 5, 2008) (reversing IJ decision to grant a bond hearing based on a decision in the relevant circuit court that had determined that the offense was not an aggravated felony because that decision was unpublished).

[27]      *See, e.g., In re Grajeda*, 2010 WL 559182, at *2 (BIA Dec. 15 2010) (rejecting *Joseph* challenge where "the conviction documents contained in the bond record [were] inconclusive with regard to whether the [alien] was removable for commission of a controlled substance violation).

[28]      However, Judge Weisel does state, "I think the government would be hard-pressed to [prevail in a Joseph hearing] without documents, without a record of conviction," and "[w]ithout documents, it would be hard for the government to prevail." Weisel Tr. 110:3-5, 16-17.

Plaintiffs further argue that their proposed alternative standard -- rejecting mandatory detention at custody redetermination hearings for those who possess a "substantial challenge" to their inclusion under Section 1226(c) -- would greatly enhance the protection of an alien's liberty interest. The proposed standard for whether a convicted defendant may be released on bail pending his or her appeal, borrows the "substantial question" analysis from *U.S. v. Smith*, 793 F.2d 85 (3d Cir. 1986), and "requires that the issue on appeal be *significant* in addition to being novel, not governed by controlling precedent or fairly doubtful." *Smith*, 793 F.2d at 88. According to Plaintiffs, this standard would potentially allow aliens to successfully challenge their inclusion under Section 1226(c) so long as the legal basis for their inclusion has not been decided by the Supreme Court, and would allow for a case-by-case analysis of whether a particular alien's challenge was "substantial."[29]

The Government, on the other hand, argues that the preliminary nature of the *Joseph* hearing does not create a constitutionally impermissible risk of erroneous deprivation of an alien's liberty interest, since aliens have another, more substantial bite at the apple to prove they are not subject to Section 1226(c) in their removal proceedings, at which point the burden of proof is on ICE, not the alien. Therefore, requiring the alien to establish the inapplicability of Section 1226(c) under the

---

[29]   Plaintiffs illustrate their proposed standard by pointing to Sukhu's claims. "Under the current BIA standard, Mr. Sukhu would bear the burden of identifying controlling circuit precedent that renders the Government's charge effectively frivolous. Under Plaintiffs' proposed standard, it is the Government that would have to bear the burden of showing that Mr. Sukhu's challenge is not substantial." Pls.' Cross-Mot. at 30.

"substantially unlikely to prevail" standard does not, according to the Government, raise constitutional concerns. To that end, the Government analogizes to (1) *Morissey v. Brewer*, 408 U.S. 471, 484-490 (1972), which noted the distinction and differing due process requirements between preliminary, informal bail hearings for parolees suspected of violating the terms of their parole and the ensuing formal bail revocation hearings,[30] and (2) preliminary injunction hearings, in which the movant has a high burden of proof—"substantial likelihood" of success on the merits to procure an injunction—"before the facts are developed to a full extent through the normal course of discovery." *Amer. Tel. & Tel. Co. v. Winback and Conserv Program, Inc.*, 42 F.3d 1241, 1426-27 (3d Cir. 1994).   Furthermore, the Government advances that the *Joseph* standard is not toothless because the IJ assesses whether there is "reason to believe that this person falls within a category barred from release under applicable law," *Joseph I*, 22 I. & N. Dec. at 668, such as, U.S. citizenship, mistaken identity, or vacation of the alleged conviction.  *See* Weisel Tr. 95:16-19; *see, e.g., Joseph*, 22 I. & N. Dec. at 806; *Matter of Davey*, 26 I. & N. Dec. 37 (BIA 2012); *In re Hernandez*, 2012 WL 3911850 (BIA 2012).

---

[30]    Plaintiffs, however, attack the Government's reliance on *Morrissey*, arguing that "criminal parolees provide an entirely inapposite comparison to civil detainees. Parolees are still under compulsion of serving a criminal sentence, and remain subject to criminal imprisonment during the balance of their sentence." Pls.' Reply Br. at 8. "Revocation [of parole] deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on the observance of special parole restrictions." I note, however, that the Supreme Court has since made clear that individuals do not enjoy absolute liberty, even from civil detention. *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997).

I now turn to weighing the *Mathews* factors to determine whether the current Joseph standards violate the Constitution and if so, what remedy is necessary to prevent such violation. This Court recognizes, as I must, pursuant to the Supreme Court and the Third Circuit precedent, that the Government has a compelling interest under § 1226(c) in detaining aliens pending their removal proceedings and preventing them from absconding during those proceedings, despite competing liberty interests that the Constitution safeguards. However, it is my task to balance governmental interests with those of the detained aliens. In that respect, having surveyed BIA decisions regarding *Joseph* hearings, I find that there is a real risk that the liberty interests of a narrow class of aliens -- those who cannot establish that ICE is "substantially unlikely" to prevail in its charges against them but who are ultimately not subject to Section 1226(c) -- will be erroneously deprived. My analysis begins with the "reason to believe" standard which ICE uses to issue its NTAs, and which, according to the Government, the IJ also uses to test the sufficiency of the Government's evidence in the first instance during the *Joseph* hearing.

The "reason to believe" language is set forth in the regulations and the commentary accompanying them: an authorized ICE agent may detain an alien if there is "reason to believe that this person was convicted of a crime covered by the statute." 63 Fed. Reg. 27444; 8 C.F.R. § 236.1; *Diop*, 656 F.3d at 230. The law is clear that this determination is made at the agency level in the first instance. However, what is not clear is whether an IJ uses the same standard to assess the Government's initial burden at a *Joseph* hearing. And, if the IJ does indeed analyze the matter

using the "reason to believe" standard, the Government nowhere explains what considerations go into the IJ finding a "reason to believe" that an alien is subject to mandatory detention under Section 1226(c).  I find that the Constitution demands a more exacting standard under the *Mathews* test, particularly since the Supreme Court has recognized the importance of the protections the *Joseph* hearing is intended to afford.  *See Demore*, 538 U.S. at 514 n.3.

The confusion starts with the *Joseph* decision.  Under that decision, it is not clear that ICE explicitly bears any sort of evidentiary burden at a *Joseph* hearing.  The *Joseph* court stated,

> the "reason to believe" that the alien "falls within a category barred from release," which led the [INS] to bring a particular charge, can often be expected to suffice until the Immigration Judge resolves the merits of the removal case, a resolution that frequently occurs speedily in cases involving detained criminal aliens. But the Immigration Judge is able to examine the basis for that charge and make an independent determination whether the alien "actually falls within a category of aliens subject to mandatory detention." In requiring that the Immigration Judge be convinced that the Service is substantially unlikely to prevail on its charge, when making this determination before the resolution of the underlying case, we provide both significant weight to the Service's "reason to believe" that led to the charge and genuine life to the regulation that allows for an Immigration Judge's reexamination of this issue.

*Joseph*, 22 I. & N. Dec. at 807.  Nowhere does the BIA delineate the requirements of the "reason to believe" standard.  Indeed, since the *Joseph* decision, contrary to the Government's position, immigration courts have focused almost exclusively on *Joseph*'s language imposing the burden on the alien to prove that ICE is "substantially unlikely to prevail."  *See, e.g.*, *In Re: Raul Capi-Esquivel A.K.A. Raul Esquivel-Capi*, 2011 WL 1792600, at *1 (DCBABR Apr. 13, 2011) ("In a so-called

'Joseph' hearing, the respondent bears the burden of establishing that DHS would be substantially unlikely to prevail on a charge of removability under a section of the Act mandating custody."). However, the Government does not claim, and the Court has found no case holding, that ICE bears any sort of formal burden at a *Joseph* hearing. Moreover, even if ICE has an initial burden of proof, it is unclear how an IJ evaluates whether ICE has met its burden.

Furthermore, the deposition of Judge Weisel, the assistant chief immigration judge, is telling as to the practice of IJs at *Joseph* hearings. Judge Weisel's testimony reveals that there do not appear to be any objective standards under which IJs evaluate the Government's proffered evidence at the *Joseph* hearing. *See* Weisel Tr. 105:12-15 ("The government may produce a record of conviction. I don't know what evidence the government would use. They could even produce testimony" to show they would likely prevail at the merits proceedings.). And, indeed, according to Judge Weisel, it appears, at times, the IJs do not even require the Government to produce any evidence. *See Id.* at 107:21-108:11; 109:22-24 ("It would behoove the government to produce documents to demonstrate that they would be able to prevail."); 110:19-21 (Judge Wiesel testified that it is not impossible for the government to prevail without any evidence). On the other end of the spectrum, Judge Weisel anecdotally points to one judge, as an example, who has required fingerprints of an alien to prove identity at a custody redetermination hearing. But, Judge Weisel does not suggest that IJs generally impose that type of burden on the Government during a *Joseph* hearing.

One thing is clear from Judge Weisel's testimony and the case law: there is no uniform standard by which to assess the Government's initial burden under the "reason to believe" analysis.  Among its inadequacies, questions remain (1) whether the reason to believe analysis imposes a subjective standard or otherwise; (2) whose belief the IJ must evaluate; and (3) what, if any, evidence would be sufficient to justify the belief. And, finally, there is scant precedent to guide the IJ.  Exacerbating the ill-defined process, the Government tacitly concedes that "[t]he burden on the Government during a *Joseph* hearing may change over time and in relation to the allegations and evidence presented by the alien"; this concession raises the vexing question of how an alien is able to prepare his or her argument against mandatory detention while navigating a seemingly constantly shifting procedural landscape. Thus, based on the current standard, it is likely that an individual may be deemed subject to mandatory detention even if ICE merely presented a scintilla of unrefuted evidence.  This result, as a matter of constitutional jurisprudence, is a serious deprivation of an individual's liberty interest that is not justified by the Government's interests under § 1226(c).

Accordingly, because the Government's initial burden, i.e., "reason to believe" that the alien is subject to mandatory detention, at the *Joseph* hearing is virtually undefined—and, at best, minimal—and the individual's burden under the "substantial unlikely" standard is particularly heavy, I find that the current *Joseph* hearing standard creates a high risk of an erroneous deprivation of Plaintiffs' liberty

interests.   Having made that finding, I, next, determine to what standard the Government should be subjected in carrying its initial burden at a *Joseph* hearing.

I need go no further than the Government's own concession.  On its motion, the Government repeatedly equates the "reason to believe" standard to that of a probable cause inquiry.  However, as a practical matter and in the absence of any judicial precedent, the probable cause standard has not been articulated or adopted by any immigration judges or even the Government itself.  Yet, I find the probable cause standard is sufficient to ameliorate any potential wrongful deprivation of liberty an alien may suffer in light of his or her "substantially unlikely to prevail" burden at *Joseph* hearings.  In fact, if ICE were to establish to the satisfaction of an IJ at the *Joseph* hearing that there is probable cause to place an alien in mandatory detention, prior to the alien presenting his or her objections, the alien would be better able to meet the challenge and the "substantially unlikely" to prevail burden the alien currently bears would not, in this Court's view, be constitutionally infirm.   This conclusion has substantial support in the case law. *See Mich. v. Summers*, 452 U.S. 692, 697 (1981).

On one hand, probable cause, albeit in a criminal context, protects an individual's liberty under the Constitution; such protection cannot be compromised. *See id.*  Because mandatory detention in the immigration context deprives aliens of their liberty interests, it is prudent to impose the probable cause standard to protect those interests.  Indeed, the probable cause inquiry has been the subject of numerous court decisions and the parameters of this standard are well-known.  In that regard,

immigration judges would have at their disposal an arsenal of precedents to guide them in determining whether the Government has met such a burden.  On the other hand, heeding the Supreme Court's admonition that the purposes of § 1226(c) mandatory detention are compelling as is the Government's interest in efficiently administering justice, the Court finds that the probable cause inquiry sufficiently takes into account those governmental interests, while adequately balancing the liberty interests of individuals.

The probable cause inquiry does not require a rigorous showing by the Government, nor any burdensome or rigid analysis on the part of an IJ.  In fact, the probable cause standard would only place a minimal additional burden on the Government.  To illustrate, in the *Joseph* context, under a probable cause analysis, an IJ would examine whether the facts and circumstances, based upon reasonably trustworthy information, are sufficient to warrant a prudent man to believe that the alien is subject to mandatory detention under § 1226(c).  *See United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002).  Probable cause requires "the kind of 'fair probability' on which 'reasonable and prudent people, not legal technicians, act." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013).  While the test is "fluid," importantly, and contrary to the current "reason to believe standard," it contains an objective component -- the "reasonably prudent man" standard -- which can adequately be reviewed by judges. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  By contrast, the "reason to believe" standard, to the extent it exists as ICE's burden of proof in a *Joseph* hearing, has no clear objective component.

44

Importantly, requiring ICE to satisfy the IJ that there is probable cause for mandatory detention before the alien has to prove that ICE is "substantially unlikely" to prevail at the merits hearing, does not disturb congressional intent to prevent potentially deportable aliens from committing more crimes or fleeing before their removal proceedings; as always, an individual who has succeeded in a *Joseph* hearing would then proceed to a bond hearing, where he or she may still be subject to detention if an IJ determines the alien is a flight risk or a danger to the community.

I note, however, in the criminal context, in evaluating whether there was probable cause to search or make an arrest, courts examine the facts and circumstances known to the officer at the time he or she took action. *See Burton*, 288 F.3d at 98.  Here, because Plaintiffs only challenge the standards applied at the hearing, not at ICE's initial custody determination, I make no findings about the constitutional adequacy of ICE's initial determination in issuing an NTA.  Rather, the probable cause inquiry imposed by the Court here only concerns an IJ's initial determination whether the Government's evidence supports a finding that the alien is subject to § 1226(c)'s mandatory detention.  In that regard, the IJ should examine the facts and circumstances known to ICE, and of which ICE has reasonably trustworthy information, at the time of the *Joseph* hearing to determine whether a reasonably prudent person would believe that the alien had committed the offenses triggering mandatory detention.

I next address whether the alien's subsequent burden of showing that the Government is "substantially unlikely to prevail" at the merits hearing violates due

process.  There is no dispute that the alien bears a high burden of proof at a *Joseph* hearing.   As a result, Plaintiffs argue that such a burden should not survive constitutional scrutiny.   Plaintiffs propose a less stringent standard: that the alien has to only show that he or she has a substantial challenge to the bases for mandatory detention.   However, in light of the imposition of a probable cause inquiry as the Government's initial burden at a *Joseph* hearing, I do no find that Plaintiffs' subsequent burden at the *Joseph* hearing violates due process.

On this issue, I must balance the interest of the Government against the liberty concerns of the alien.   There is no doubt that Congress has a compelling governmental interest in regulating, and the authority to regulate, the conduct of aliens.   *Flores*, 507 U.S. at 303-06.   To that end, in general, "detention during the deportation proceedings [is] a constitutionally valid aspect of the deportation process."   *Demore*, 538 U.S. at 523.   Indeed, the reason that an alien's right to be at liberty is circumscribed is because of national interest considerations.   A reading of *Demore* suggests that the Government need not bear a heavy burden to justify detaining an alien pending a more formal hearing.   To require more, would impermissibly undermine ICE's authority and the purposes underlying § 1226(c).   As Justice Kennedy wrote: "due process requires individualized procedures to ensure that there is at least some merit to [ICE's] charge, and therefore, sufficient justification to detain a lawful permanent alien pending a more formal hearing."   *Demore*, 538 U.S. at 531 (Kennedy, concurring).   "At least some merit" certainly is a much lower standard than the one Plaintiffs propose here.

Moreover, the Supreme Court has advised, albeit not in the context of a *Joseph* hearing, that preliminary hearings are different and distinct than final hearings on the merits. *See Morrissey*, 408 U.S. at 488. The difference, as the Supreme Court advised, is that preliminary hearings are less formal and not rigorous, while merit hearings call for formal findings of fact and conclusions of law. *Id.* at 487. In that connection, preliminary and final hearings each impose different evidentiary standard. *Id.* at 490-91. Here, the *Joseph* hearing and the final removal hearing, too, are separate and distinct proceedings, each with a different set of burdens of proof. Yet, Plaintiffs propose that, at a *Joseph* hearing, so long as the alien can show that he or she has a substantial challenge to the Government's determination under § 1226(c), he or she should not be subject to mandatory detention. However, in order for an IJ to decide whether an alien has a substantial challenge, the IJ would necessarily engage in a potentially more expansive analysis of the merits of an alien's detention. This type of review could obviate the purpose of, and the need for, a final removal hearing.

After a weighing of the different interests, I do not find that the Constitution requires altering the alien's burden of proof at a *Joseph* hearing. On one hand, because I recognize that the alien has a liberty interest in not being erroneously detained by the Government, the imposition of a probable cause standard will protect against such errors. On the other hand, however, the private interest does not trump the Government's compelling interest, as set forth by the Supreme Court and the Third Circuit, in detaining aliens who have committed certain crimes pursuant to §

1226(c).  To impose a higher burden on the Government than the current standard would severely undermine the purposes of the statute.

In sum, I grant in part Plaintiffs' summary judgment motion by imposing a probable cause standard on the IJ's initial determination of whether the Government has a sufficient basis to detain individuals under § 1226(c).  In light of this procedural protection, I do not find that Plaintiffs' proposed standard -- a showing that the alien has a substantial challenge to the Government's basis for detention under § 1226(c), as opposed to the alien's current standard of showing the Government is substantially unlikely to prevail -- is constitutionally required.  Instead, at that juncture of the proceedings when probable cause is obtained and when the alien has the opportunity to object to the bases for his or her mandatory detention, the alien will have received constitutionally sustainable due process.  I grant in part the Government's motion in this context.

## V.    Lack of a Contemporaneous Verbatim Record

The Government initially contended that Plaintiffs lack standing to claim that ICE's practice of not contemporaneously recording *Joseph* hearings is unlawful, because both Gayle's and Sukhu's custody redetermination hearings were recorded. The Government appears to have abandoned this argument because it concedes in its opposition to Plaintiffs' cross-motion for summary judgment that Plaintiffs did not, in fact, receive a custody redetermination hearing. Accordingly, the Court will not analyze this argument.  I proceed to the parties' arguments on the merits.

Both parties move for summary judgment on Plaintiffs' claim that the Government's policy of failing to require that contemporaneous verbatim records of *Joseph* hearings be made and kept has resulted in statutory and constitutional violations under the Fifth Amendment's due process clause. The Government argues that a contemporaneous verbatim record of *Joseph* hearings is not required by the INA and its applicable regulations, the Third Circuit, the Supreme Court, or the Constitution. In support, the Government points to (1) the distinction between merits hearings and preliminary hearings (into which they classify *Joseph* hearings) codified in the INA,[31] its regulations,[32] and the Executive Office of Immigration Review's operating manual;[33] and (2) the Supreme Court's decision not to impose a contemporaneous verbatim records requirement in criminal trials.[34]

---

[31]  *Compare* 8 U.S.C. § 1229a(b)(4)(C) requiring a "complete record . . . of all testimony and evidence produced" in a removal proceeding *with* 8 U.S.C. § 1226 (containing no such specific requirement with respect to the process of ascertaining whether an alien is subject to mandatory or discretionary immigration detention).

[32]  *See, e.g.*, 8 § C.F.R. 1003.19(d) (consideration of custody matters "shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding"); *accord Matter of Guerra*, 24 I. & N. Dec. at 40 n.2 ("Bond proceedings are separate and apart from the removal hearing."); *see also Matter of Adeniji*, 22 I & N. Dec 1102, 1115 (BIA 1999) (noting that an IJ writes up a bond memorandum as a record of a bond proceeding).

[33]  Immigration Court Practice Manual § 9.3(e)(iii) ("Bond hearings are generally not recorded."); *see also Matter of Chirinos*, 16 I. & N. Dec. 276, 277 (BIA 1977) ("[T]here is no right to a transcript of a bond redetermination hearing. Indeed there is no requirement of a formal 'hearing.'").

[34]  *Mayer v. City of Chicago*, 404 U.S 189, 193-94 (1971) (requiring "that the State must afford the indigent a record of sufficient completeness to permit proper consideration of (his) claims" but noting that "[a] record of sufficient completeness does not translate automatically into a complete verbatim transcript").

Plaintiffs, on the other hand, urge the Court to conduct an independent analysis of whether due process compels the availability of a contemporaneous verbatim record of *Joseph* hearings under the *Mathews* balancing test. Under the *Mathews* test, Plaintiffs argue, Plaintiffs' substantial private interests in remaining free and preventing errors resulting from memorandum decisions prepared after-the-fact outweigh the minimal burden ICE would incur in activating the recording equipment already installed and used in other contexts by the immigration courts.

As with my due process analysis of the *Joseph* standards, because the parties do not dispute whether Plaintiffs have identified a substantial private interest in remaining free from detention under *Mathews*, the Court turns to the next factor of analysis: "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335.

To begin, I look for guidance from due process case law in other contexts. In that regard, I find the non-dispositive nature of *Joseph* hearings similar to the preliminary hearings held for parolees who have potentially violated their parole. In *Morrissey*,[35] the Court examined the minimum due process requirements for such preliminary hearings as well as the final parole revocation hearing. At the preliminary hearing, the Court found that

---

[35]    While I note that the liberty interest at stake in *Morrissey* is not the same as the liberty interest at stake here, *see supra*, I do find that the existence of a preliminary and final procedure in the parole revocation context and the attendant recording requirements useful for comparison purposes.

> [t]he hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given in support of parole revocation and of the parolee's position. Based on the information before him, the officer should determine whether there is probable cause to hold the parolee for the final decision of the parole board on revocation. Such a determination would be sufficient to warrant the parolee's continued detention and return to the state correctional institution pending the final decision. . . . [T]he decision maker should state the reasons for his determination and indicate the evidence he relied on but it should be remembered that this is not a final determination calling for formal findings of fact and conclusions of law. No interest would be served by formalism in this process; informality will not lessen the utility of this inquiry in reducing the risk of error.

*Morrissey*, 408 U.S. at 487 (internal citation and quotation marks omitted). Similar to the parolees in *Morrissey*, alien detainees under section 1226(c) are entitled to a hearing to determine whether ICE is "substantially unlikely to establish at the merits hearing, or on appeal, the charge or charges that would otherwise subject the alien to mandatory detention." *Joseph*, 22 I. & N. at 806. Even if the IJ presiding over a *Joseph* hearing finds that the Government is substantially likely to prevail on its charges and the alien is ordered into mandatory detention, the alien receives another chance to contest the applicability of Section 1226(c), or any other basis to contest removal, in the ensuing removal proceedings, and to potentially secure freedom from detention as well as from removal.[36] Put differently, because of the preliminary nature of *Joseph* hearings, under *Morrissey*, there is no constitutional infirmity in failing to require a contemporaneous verbatim record in *Joseph* hearings. *See Fahy*

---

[36]    Further, as the Third Circuit found in *Diop*, an alien who has been subjected to mandatory detention for an unreasonably prolonged amount of time before removal proceedings is accorded an individualized bond determination, mitigating the liberty interest impairment created by mandatory detention. *Diop,* 656 F.3d at 221.

*v. Horn,* 516 F.3d 169, 190 (3d Cir. 2008) (While "[i]t is indisputably true that a criminal defendant has the right to an adequate review of his conviction, i.e., a sufficiently complete record . . . ., neither the Supreme Court, nor our Court, has held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief."). (citing *Mayer v. City of Chicago*, 404 U.S. 189, 198 (1971)).

As a practical matter, the typical evidence presented at a *Joseph* hearing also weighs against the necessity of requiring contemporaneous verbatim records in such hearings, and Plaintiffs fail to demonstrate otherwise. The Government advances, and Plaintiffs do not dispute, that *Joseph* hearings "generally turn on a review of conviction records and consideration of the arguments of counsel," as opposed to sworn witness testimony. *See* Defs.' Br. Opp. Pls.' Cross-Mot. Summ. J. at 31; *see also* Weisel Tr. 64:16-20, 95:24-25, 96:2-4. Thus, "even though the only record of a *Joseph* hearing is the IJ's resulting order, which may simply be a check mark on the Form I-286 or a written summary order," a detainee's arguments against mandatory detention can still be presented on appeal without the aid of a contemporaneous verbatim record. Importantly, Plaintiffs merely mention, in passing, the "risk of error occasioned by memorandum decisions" without further explanation. As such, Plaintiffs fail to tangibly demonstrate the risk of erroneous deprivation of their liberty interest resulting from the lack of a contemporaneous verbatim record. *See* Weisel Tr. 130:10-12 ("I really haven't had the need to use DAR [digital audio recordings] to determine the accuracy of my trial notes.").

Moreover, IJs are not prohibited from recording *Joseph* hearings if they wish to do so, *see* Weisel Tr. 130:19-20, 131:3-4, and existing immigration procedures already provide that formal bond hearings may be required when prejudice would result from following more informal procedures. Because of these already existing safeguards, "there is no requirement in bond proceedings for a formal hearing and that informal procedures may be used so long as no prejudice results." *In Re Mohammad J.A. Khalifah*, 21 I. & N. Dec. 107, 112 (BIA 1995). Because I find that a summarized record of *Joseph* hearing proceedings is adequate for purposes of appeal, I find that the second *Mathews* factor weighs against requiring contemporaneous verbatim records of *Joseph* hearings.

Plaintiffs focus their argument on the third prong of the *Mathews* analysis: that the Government has a low interest in maintaining its current policy of not requiring contemporaneous verbatim records in *Joseph* hearings. Plaintiffs reason that the Government does not dispute that "digital audio recording equipment is available in every immigration court that conducts any hearing granted to an alien detained under 8 U.S.C. 1226(c) who requests a custody redetermination." Defs.' Resp. to Pls.' Stmt. of Mater. Facts at ¶¶ 19-21.  Nor does the Government dispute that "[i]t would not be more burdensome for the IJ to record a *Joseph* hearing than a removal hearing, which is always recorded." *Id.* ¶ 21.  While the Government does not articulate the extent to which requiring a contemporaneous verbatim record in *Joseph* hearings would impose a fiscal or administrative burden, any additional burden in requiring that a record be kept would necessarily result in more procedural

complexity. For example, if an immigration court's digital audio recording equipment was malfunctioning for some reason, a *Joseph* hearing could not take place. *See* Weisel Tr. 127:15. Further, immigration courts would have to preserve all of their *Joseph* hearing recordings for appeal, creating an additional administrative burden. *See id.* at 128:15-16 (explaining that audio recordings of removal proceedings are transferred to a central location in Northern Virginia to be kept for an unspecified period of time). Therefore, I find that the Government would bear at least a minimal burden in complying with a contemporaneous verbatim records requirement for *Joseph* hearings.

Finally, Plaintiffs urge the Court to adopt the reasoning in *Singh v. Holder*, wherein the Ninth Circuit held that a contemporaneous verbatim record was required in *Casas* hearings. *Singh*, 638 F.3d 1196 (9th Cir. 2011). However, the Court finds *Singh* distinguishable because the hearings at issue in that case materially differ from *Joseph* hearings. *Casas* hearings are "bond hearings for aliens facing prolonged detention while their petitions for review of their removal orders are pending." *Id.* at 1200. Because they are individualized hearings turning on whether an alien is a flight risk or a danger to the community, *Casas* hearings often involve witness testimony in the form of direct and cross-examination as well as a more general examination of an alien's personal history. *See id.* at 1201-02. *Joseph* hearings, on the other hand, solely consider evidence pertaining to an alien's past convictions and determine whether ICE is "substantially unlikely" to prevail in its "charge or charges that would otherwise subject the alien to mandatory detention." *Joseph*, 22 I. & N. Dec. at 806.

Because any prejudice that would result from failing to require a contemporaneous verbatim records requirement in *Joseph* hearings is significantly lower than that which would result from failing to contemporaneously record the testimony and statements made at *Casas* hearings, I do not find the Ninth Circuit's holding in *Singh* persuasive for the purposes of my analysis here.

This Court concludes that under a balancing of the *Mathews* factors, while an alien's interest in remaining free is indisputably substantial, the lack of a contemporaneous verbatim transcript in the *Joseph* hearing does not create a high risk of erroneous deprivation of an alien's liberty interest.  Further, requiring contemporaneous verbatim records would not add substantial value as a procedural safeguard. Thus, even though the Government's burden resulting from requiring contemporaneous verbatim records of *Joseph* hearings appears relatively slight, the *Mathews* factors tip against finding such a constitutional requirement. *See, e.g.*, *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 642 (6th Cir. 2005) (finding that while the administrative cost of a proposed alternative procedure "would likely be minimal, the additional safeguard in this case is negligible" and accordingly finding Due Process "do[es] not warrant such a safeguard").

That said, however, my legal holding rests upon the minimal protection that the Constitution requires.  But, as a matter of sound practice, I find that recording the *Joseph* proceedings would be a preferable practice, particularly since there is little burden on the part the Government or the immigration courts to impose such a procedure, and the equipment is generally available.  In my view, whenever an

individual's liberty is at stake, any protections to avoid errors should be considered and encouraged. Nonetheless, that protection is not constitutionally required; therefore, I grant summary judgment for the Government on this issue.

## VI.    Injunctive Relief

The Government argues that under 8 U.S.C. § 1252(f)(1), the Court is barred from granting injunctive relief to the putative class of plaintiffs even in the event that the Court finds they have been harmed, because Section 1252(f)(1) bars courts other than the Supreme Court from enjoining or restraining the operation of Section 1226(c). *See* 8 U.S.C. § 1252(f)(1).[37] Plaintiffs, however, argue that they do not seek to enjoin or restrain the operation of Section 1226(c), but rather request that the Government be enjoined from violating or misapplying the statute. On this issue, the Court has already considered and addressed the Government's position. In the March 14th opinion, I stated,

> [i]n focusing on the nature of Plaintiffs' challenge—which, again, is based on the claim that the Government's current mandatory detention procedures violate the INA—it does not appear that § 1252(f)(1) precludes Plaintiffs from pursuing injunctive relief. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir.2010) ("Section 1252(f) prohibits only injunction of 'the operation of' the detention statutes, not injunction of a violation of the statutes."). Plaintiffs are not challenging mandatory

---

[37]    8 U.S.C. § 1252(f)(1) states,

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

> detention per se, acknowledging that such a challenge is not available
> in light of the *Demore* decision. Instead, Plaintiffs question the
> constitutional adequacy of the *Joseph* hearing and related procedures
> meant to ensure that the Government mandatorily detains only those
> aliens who should be detained under § 1226(c). In light of this, and given
> the Government's cursory treatment of this issue and the lack of
> authority to support its position, the Court declines to dismiss Plaintiffs'
> claims for injunctive relief at this point. In any event, Plaintiffs clearly
> may seek class-wide declaratory relief without running afoul of §
> 1252(f). *Alli v. Decker*, 650 F.3d at 1016.

*Gayle*, 4 F.Supp.3d at 721.  In asking the Court to rule otherwise, the Government has not presented any bases to disturb my previous decision in this context. Therefore, the Government's argument is rejected.

As a result of my findings herein, the Government shall be enjoined from using the current revised version of the Form I-286.  The Government is directed to amend Form I-286 consistent with this Opinion.   In addition, during a custody redetermination hearing, i.e., *Joseph* hearing, the Government must initially satisfy an Immigration Judge that there is probable cause to find that that a detained alien falls within the mandatory detention requirements under Section 1226(c).

## VII.   Class Certification

In connection with their constitutional claims, Named Plaintiffs seek to certify a class of all individuals who are or will be detained within the State of New Jersey pursuant to the mandatory detention provision of § 1226(c) and who have a substantial challenge to "threshold deportability" or "inadmissibility" on one of the statutory grounds that trigger mandatory detention.  Having determined the merits of Named Plaintiffs' claims, I do not find certification of a class necessary.

In *Ihrke v. Northern States Power Co.*, 459 F.2d 566 (8th Cir. 1972), *vacated on other grounds*, 409 U.S. 815 (1972), the Eight Circuit declared that "(t)he determination of the constitutional question can be made by the Court and the rules and regulations determined to be constitutional or unconstitutional regardless of whether this action is treated as an individual action or as a class action.  No useful purpose would be served by permitting this case to proceed as a class action." 459 F.2d at 572.  Consistent with this principle, courts across the country have considered the class device superfluous when the plaintiff has challenged a statute as facially unconstitutional. As one judge has voiced, "It makes me wonder why the complexities of Federal Rule of Procedure 23 are entered into when the declaration of unconstitutionality for one would, or at least should, in effect proclaim unconstitutionality for all ...." *Bond v. Dentzer*, 325 F. Supp. 1343, 1352 (N.D.N.Y. 1971).

Indeed, other circuits have followed the *Ihrke* approach. *See Carter v. Butz*, 479 F.2d 1084, 1089 (3d Cir. 1973); *James v. Ball*, 613 F.2d 180, 186 (9th Cir. 1979); *Craft v. Memphis Light, Gas and Water Div.*, 534 F.2d 684, 686 (6th Cir. 1976);; *Martinez v. Richardson*, 472 F.2d 1121, 1127 (10th Cir. 1973) ("But as we view it, a class action was not demanded here because the same relief could be afforded without its use and seemingly the court had something of this kind in mind when it provided in paragraph 6 of its findings for further enforcement action if the same should become necessary. Thus the court was thinking of future compliance and this was, of course, the important problem."); *United Farmworkers of Florida Housing Project,*

*Inc. v. City of Delray Beach*, 493 F.2d 799, 812 (5th Cir. 1974); *Cockerel v. Caldwell*, 378 F. Supp. 491, 494 (W.D. Ky. 1974); *Doe v. Wohlgemuth*, 376 F. Supp. 173, 181-82 (W.D. Pa. 1974), *vacated on other grounds sub. nom. Doe v. Bea*l, 523 F.2d 611, 613, n. 2 (3rd Cir. 1975) (en banc); *Koehler v. Ogilvie*, 53 F.R.D. 98, 101 (N.D. Ill. 1971), aff'd mem., 405 U.S. 906 (1972); *Holt v. Brown*, 336 F. Supp. 2, 6 (W.D. Ky. 1971) (three-judge court); *Nelson v. Likins*, 389 F. Supp. 1234, 1239 (D. Minn. 1974); *Mohr v. Jordan*, 370 F. Supp. 1149, 1151 n. 3 (D. Md. 1974); *Rappaport v. Katz*, 62 F.R.D. 512, 515 (S.D.N.Y. 1974); *Bonser v. New Jersey*, 605 F. Supp. 1227, 1236 (D.N.J. 1985)

The reasoning is straightforward: if the statutes, regulations or policies at issue are held to be unconstitutional, such decision would be binding on all of the governmental agencies and would indeed inure to the benefit of all members of the proposed class, thus obviating the need for a lawsuit to proceed as a class action. *See Craft*, 534 F.2d at 686 ("As to a Rule 23(b)(2) class asserting claims to injunctive and declaratory relief, the district court properly recognized that such relief to the extent 'granted [would] . . . accrue to the benefit of others similarly situated,' and, consequently, . . . 'no useful purpose would be served by permitting this case to proceed as a class action' because 'the determination of the constitutional question can be made by the Court and the rules and regulations determined to be constitutional or unconstitutional regardless of whether this action is treated as an individual action or as a class action.'" (quoting *Ihrke*, 459 F.2d at 572)); *United Farmworkers of Fla. Housing Project*, 493 F.2d at 812 ("Even with the denial of class

action status, the requested injunctive and declaratory relief will benefit not only the individual appellants and the nonprofit corporation but all other persons subject to the [discriminatory] practice under attack."); *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir. 1973) ("[A]n action seeking declaratory or injunctive relief against state officials on the ground of unconstitutionality of a statute . . . is the archetype of one where class action designation is largely a formality, at least for the plaintiffs."); *Martinez*, 472 F.2d at 1127 ("[A] class action was not demanded here because the same relief could be afforded without its use.").

More recently, district courts have adhered to this rule. *See Mills v. District of Columbia*, 266 F.R.D. 20, 22 (D.D.C. 2010) ("Class certification is particularly unnecessary where . . . 'the suit is attacking a statute or regulation as being facially unconstitutional.' . . . In that circumstance, 'there would appear to be little need for the suit to proceed as a class action' because 'it can be assumed that if the court declares the statute or regulation unconstitutional then the responsible government officials will discontinue the [regulation's] enforcement.'" (internal citations omitted)); *Arnett v. Strayhorn*, 515 F. Supp. 2d 690, 698 (W.D. Tex. 2006) ("The only issue remaining in this case is Plaintiff's challenge to the constitutionality of the Texas Unclaimed Property statute. . . . No useful purpose would be served by requiring this case to proceed as a class because all individuals who are not a part of this action, but who are aggrieved by the Texas Unclaimed Property Law in the same manner as Plaintiff, will have the benefit of this Court's ruling concerning the statute's constitutionality."); *Phelps v. Powers*, 295 F.R.D. 349, 356-57 (D. Iowa 2013);

*Johnson v. City of Opelousas*, 488 F. Supp. 433, 435-36 (W.D. La. 1980) ("[A] class action is unnecessary to insure an appropriate examination of the constitutionality of the [juvenile curfew] ordinance in question [because] [a]ny declaratory or injunctive relief given in the individual action of the named plaintiffs would inure to the benefit of other similarly situated minors.").

Here, I have already determined that ICE's use of the revised Form I-286 does not satisfy procedural due process, and that IJs' application of a "reason to believe" standard at the *Joseph* hearing is constitutionally infirm.   As a result, the Government is directed by this Court to amend Form I-286 and *Joseph* hearings shall be conducted consistent with the rulings made herein.   In that regard, no useful purpose would be served by certifying a class because all aliens who are subjected to mandatory detention would benefit from the injunctive relief and remedies that this Court has imposed.   Accordingly, I deny Plaintiffs' motion to certify a class as unnecessary.

CONCLUSION

For the foregoing reasons, the Court decides the parties' summary judgment motions as follows: summary judgment is (1) **GRANTED** in favor of Plaintiffs as to their adequacy of notice claim; (2) both parties' motion are **GRANTED** in part and **DENIED** in part as to Plaintiffs' claim related to the constitutionality of the *Joseph* hearing; and (3) **GRANTED** in favor of the Government as to Plaintiffs' contemporaneous verbatim records claim.   Finally, the Court **DENIES** Plaintiffs' motion to certify a class.

An appropriate order shall follow.

Date:  January 28, 2015                                /s/          Freda L. Wolfson
                                                        Hon. Freda L. Wolfson
                                                        United States District Judge