*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————————— :
GARFIELD O. GAYLE, *et al.*,            :
                                         :
                          Plaintiffs,    :      Civil Action No. 12-2806 (FLW)
                                         :
          v.                             :
                                         :           **OPINION**
                                         :
WARDEN MONMOUTH COUNTY,                   :
CORRECTIONAL INSTITUTION,                 :
*et al.*,                                :
                                         :
                          Defendants.    :
                                         :
—————————————————————— :

**WOLFSON, Chief Judge:**

This class action challenges the constitutionality of detention procedures related to mandatory detention of aliens under 8 U.S.C. § 1226(c), codified in the Immigration and Naturalization Act ("INA"). Class representatives Garfield O. Gayle ("Gayle") and Neville Sukhu ("Sukhu") (collectively, "Plaintiffs" or "Named Plaintiffs") aver that they, and other similarly situated individuals in New Jersey, have been subjected to unconstitutional mandatory immigration detention under § 1226(c) by the United States Department of Homeland Security, Immigration and Customs Enforcement ("DHS"/"ICE"). In that connection, Plaintiffs' challenge is twofold: first, with regard to the mandatory detention scheme of § 1226(c), they argue that it is unconstitutional under the Due Process Clause that aliens, like themselves,

with substantial challenges to deportability be detained; and relatedly, such aliens, Plaintiffs say, are not subject to mandatory detention in the first instance because doing so would run afoul of the canon of constitutional avoidance. Second, Plaintiffs mount a constitutional attack on the standards determining whether an alien is properly designated as subject to mandatory detention (also known as *Joseph* hearings,[1] which was first established in *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999)), and the lack of a contemporaneous verbatim record in those *Joseph* hearings. In this suit, Plaintiffs seek declaratory and injunctive relief to enjoin the Government[2] from carrying out the current mandatory detention procedures and to require the Government to implement constitutionally adequate ones.

---

[1]      Because under 8 C.F.R. § 1003.19(h)(2)(ii) a "*Joseph* hearing" is characterized as a "custody redetermination hearing," the Court will use the terms "*Joseph* hearing" and "custody redetermination hearing" interchangeably throughout this Opinion.

[2]      In light of the substitutions under Fed. R. Civ. P. 25(d), the named Defendants include: Donald Sutton, in his official capacity as Warden of Monmouth County Correctional Institution; Kirstjen Nielsen, in her official capacity as Secretary of Homeland Security ("DHS"); William Barr, in his official capacity as Attorney General of the United States; Thomas Homan, in his official capacity as Acting Director for Immigration and Customs Enforcement ("ICE"); James McHenry, in his official capacity as Acting Director of the Executive Office for Immigration Review; John Tsoukaris, in his official capacity as Field Office Director for Enforcement and Removal Operations, Newark Field Office of ICE; Thomas Decker, in his official capacity as Field Office Director for Enforcement and Removal Operations, New York City Field Office of ICE; Steven Ahrendt, in his official capacity as Warden of the Bergen County Jail; Orlando Rodriguez, in his official capacity as Warden of the Elizabeth Contract Detention Facility; Charles L. Green, in his official capacity as Warden of the Essex County Correctional Facility; Ron Edwards, in his official capacity as Director of the Hudson County Correctional Facility; and Stephen Pringle, in his official capacity as Director of the Delaney Hall Detention Facility. These defendants will collectively be referred to as "the Government." I note that since the pendency of this case, several substituted defendant-officials have left their posts; however, the Government has not subsequently substituted any new defendants.

Both Plaintiffs and the Government separately move for summary judgment on all of the constitutional claims in this case. For the following reasons, the Court decides the parties' summary judgment motions as follows: (1) both parties' motions are **GRANTED** in part and **DENIED** in part as to Plaintiff's claim related to the constitutionality of the *Joseph* hearing; and (2) **GRANTED** in favor of the Government as to all other claims, including those related to contemporaneous verbatim records in *Joseph* hearings. As a result, the Court issues a class-wide injunction that directs the Government to establish before an immigration judge ("IJ") that there is probable cause to find that a detained alien under § 1226(c) falls under the statute's mandatory detention requirements.

## BACKGROUND

### I.  Named Plaintiffs

#### A.  Gayle

The following facts are undisputed.[3]  Gayle is a Jamaican national and legal permanent resident ("LPR") of the United States. He has lived in the United States for approximately 35 years. In May 1995, Gayle was convicted after a bench trial of

---

[3]  This case has a long procedural history.  Not only has this Court rendered multiple opinions in which the facts of this case have been thoroughly addressed, the Third Circuit, in *Gayle v. Warden, Monmouth County Correctional Institution*, 838 F.3d 297 (3d Cir. 2016)("*Gayle III*"), has also set forth the undisputed facts of this case.  More recently, I issued an opinion concerning class certification, *see Gayle v. Warden Monmouth Cty. Corr. Inst.*, No. 12-2806, 2017 U.S. Dist. LEXIS 188498 (D.N.J. Nov. 15, 2017)("*Gayle IV*"), wherein I, again, discussed the relevant facts and procedural history.  Thus, to conserve judicial resources, I will omit any citations to the record to the extent the undisputed facts have already been recounted in *Gayle IV*.

criminal possession of a controlled substance with the intent to sell in the third degree under New York State Penal Law § 220.16. In March 2007, Gayle pleaded guilty to a misdemeanor marijuana possession charge for which he was sentenced to ten days in jail. Based on these prior convictions, on March 24, 2012, ICE officers arrested Gayle, and ICE issued a Notice to Appear ("NTA"), charging Gayle with removal on the ground that his 1995 conviction rendered him deportable, and also found him subject to mandatory immigration detention based on his 2007 conviction.[4]

On September 20, 2012, Gayle filed a motion to terminate removal proceedings based on the Government's failure to prove the existence of the alleged 1995 conviction, i.e., the attempted drug sale. An IJ denied the motion on October 23, 2012. Subsequently, Gayle was mandatorily detained for approximately twelve months at the Monmouth County Correctional Facility in Freehold, New Jersey. On March 15, 2013, this Court granted Gayle's claim for individual habeas relief on a ground not at issue in this class action.[5]

---

[4] Although the Government did not charge Gayle with removal for his 2007 offense in the initial Notice to Appear, it amended the Notice in February 2013 to seek his removal for this offense in addition to the 1995 offense. *See* Additional Charges of Inadmissibility/Deportability dated February 26, 2013.

[5] I note that in February 2014, Gayle became eligible for relief from deportation for his 1995 offense under former INA § 212(c), pursuant to a change in BIA case law. *See Matter of Abdelghany*, 26 I. & N. Dec. 254 (BIA 2014)(holding that Section 212(c) relief is available to lawful permanent residents who were convicted of a deportable offense after trial). Moreover, in June 2017, the Second Circuit, according to Gayle, clarified that his 2007 offense did not constitute a controlled substance offense subjecting him to deportation. *See Harbin v. Sessions*, 860 F.3d 58 (3d Cir. 2017). In that respect, Gayle posits that the IJ has indicated that he intends to issue a written opinion granting Gayle's Section 212(c) relief. *See* Brown Decl.,¶ 8.

### B. Sukhu

Sukhu is a Guyanese national and LPR of the United States, who has lived in this country for approximately 24 years, almost entirely in New York City. In June 1997, Sukhu pleaded guilty to assault in the second degree in violation of N.Y. Penal Law § 120.05(6) and was sentenced to 90 days imprisonment. In May 2011, Sukhu pleaded guilty to a misdemeanor offense of theft of services (turnstile jumping) in violation of N.Y. Penal Law § 165.15 and was sentenced to time served. With these prior offenses, on August 15, 2011, ICE officers arrested Sukhu, and on the same day, ICE issued a Notice to Appear, charging Sukhu with removal under 8 U.S.C. §1227(a)(2)(A)(i)—which governs crimes of moral turpitude—based on his 1997 conviction.

Sukhu was subject to mandatory detention under § 1226(c) for nearly 21 months at the Monmouth County Correctional Facility in Freehold, New Jersey. On November 11, 2012, Sukhu, represented by counsel, attended a removal hearing before an Immigration Judge. On December 27, 2011, Sukhu sought to terminate his deportation proceeding on the basis that his assault conviction was not a crime of moral turpitude ("CIMT"), and thus, he was not deportable. Sukhu reasoned that the BIA decision, *Matter of Silva-Trevino*, 24 I&N Dec. 687 (AG 2008), which would categorize Sukhu's prior assault conviction as a CIMT, should not be followed.[6] *Id.* ¶

---

[6] At the time Sukhu's Motion to Terminate was pending, *Silva-Trevino* had been rejected by several Courts of Appeals, including the Third Circuit. However, two circuit courts of appeals have deferred to *Matter of Silva-Trevino*, and the matter has not yet been decided by the Second Circuit, the circuit in which Sukhu's IJ sat.

55. On March 7, 2012, the Immigration Judge rejected Sukhu's argument and found that *Silva-Trevino* mandated Sukhu's deportation based upon his assault conviction being a CIMT. On March 8, 2012, ICE filed an additional charge against Sukhu, charging him with removability under 8 U.S.C. § 1227(a)(2)(A)(ii)—two crimes of moral turpitude—based on the combination of his 1997 and 2011 convictions. On April 30, 2013, however, the IJ granted Sukhu's application for adjustment of status based on a relative petition filed by his U.S. citizen daughter, and thus, terminated his removal proceedings. On May 8, 2013, Sukhu was released from ICE custody. The Government did not appeal that ruling. Importantly, at no point during his detention did Sukhu receive a *Joseph* hearing.

## II.   Procedural History

In May 2012, Gayle filed his individual habeas petition. In November 2012, the First Amended Petition was filed, adding individual habeas claims of Sukhu and Sheldon Francois,[7] as well as claims brought on behalf of a putative class, seeking declaratory and injunctive relief. Also, on November 15, 2012, Plaintiffs moved to certify a class of all individuals who were or would be subject to § 1226(c) mandatory detention in the District of New Jersey. The Government moved to dismiss Plaintiffs' amended petition, and opposed Plaintiffs' motion for class certification.

On May 10, 2013, I heard oral argument on these motions; I dismissed Gayle's and Sukhu's individual habeas claims as moot, and denied the Government's motion

---

[7]     In *Gayle IV*, I dismissed Francois's claims based on standing grounds. As such, Francois is no longer a plaintiff in this matter.

to dismiss at that time. I further instructed Plaintiffs to file an amended habeas petition and class action complaint. Further, the parties proceeded to engage in class-related discovery.

Although Gayle and Sukhu were released from custody on March 22, 2013 and May 8, 2013, respectively, the Third Amended Petition was filed on August 5, 2013, which included individual claims, as well as claims on behalf of a putative class of aliens who are being or will be mandatorily detained pursuant to § 1226(c). The first claim asserted violations of substantive and procedural due process.

Plaintiffs' procedural due process claim challenged, and still challenges, the procedures surrounding the "*Joseph* hearing," the mechanism by which an alien who is mandatorily detained pending his removal proceedings is provided "with the opportunity to offer evidence and legal authority on the question [of] whether [ICE] has properly included him within a category that is subject to mandatory detention." *In re Joseph*, 22 I. & N. Dec. at 805. Specifically, Plaintiffs allege (1) that *Joseph* hearing procedures impermissibly place the initial burden of proof on the alien, and (2) that a contemporaneous verbatim record should be made of each *Joseph* hearing.[8]

In August 2013, the Government moved to dismiss Plaintiffs' Third Amended Complaint. Thereafter, on March 14, 2014, I partially granted the Government's motion to dismiss, holding that § 1226(c) did not violate substantive due process with

---

[8] Plaintiffs also raised a constitutional issue regarding Notice of Custody Determination through a Form I-286. However, I found that Named Plaintiffs are not proper class representatives with regard to that claim, because they did not receive the current Form I-286, which is substantially different than the previous version.

respect to aliens who assert a substantial challenge to their final, not threshold, removability. *Gayle v. Johnson,* 4 F. Supp. 3d 692, 706–12 (D.N.J. 2014)("*Gayle I*"). Thus, Plaintiffs' petition was dismissed "to the extent that Plaintiffs are requesting that a *Joseph* hearing be provided to any mandatorily detained alien who has a 'substantial challenge' to his or her removal on grounds other than whether the alien falls within the § 1226(c) categories requiring mandatory detention." *Id.* at 721. This Court held that Gayle and Sukhu had standing to challenge the Government's mandatory detention procedures, *id.* at 713–14, but found Francois lacked standing to proceed in that context, because he did not challenge whether he fell within a § 1226(c) category, *id.* at 716. The motion to dismiss was denied in all other respects; I found that Plaintiffs had "adequately stated a claim that the *Joseph* hearing fails to provide an alien, who has a challenge to whether he or she is included in § 1226(c), with a meaningful opportunity to challenge his or her detention status." *Id.* at 717.

Thereafter, the parties filed cross-motions for summary judgment, and Plaintiffs, again, moved for class certification. In January 2015, this Court issued an Opinion and Order addressing the summary judgment and class certification motions. *Gayle v. Johnson*, 81 F. Supp. 3d 371 (D.N.J. 2015)("*Gayle II*"). As to the merits of Plaintiffs' claims, I entered partial summary judgment for Plaintiffs. In that decision, I found that the *Joseph* hearing procedures violate due process *Id.* at 395–98. I also held that while it would be preferable to have a *Joseph* hearing recorded verbatim, it is not, as a constitutional matter, required. *Id.* at 402. Lastly, I denied Plaintiffs' class certification motion as moot, reasoning that certification was

"unnecessary" because the rulings on the merits of the claims meant that "all aliens who are subjected to mandatory detention would benefit from the injunctive relief and remedies that this Court has imposed." *Id.* at 404. Both parties appealed.

On September 22, 2016, the Third Circuit vacated and remanded this Court's two prior Opinions and Orders of March 14, 2014 and January 28, 2015, finding that, absent a certified class, this Court lacked jurisdiction to reach the merits of Plaintiffs' Petition, since the individual Plaintiffs' claims were moot. *Gayle III*, 838 F.3d at 303-05. The Third Circuit reasoned that by the time this Court ruled on the merits, the Named Plaintiffs had been released from detention, and therefore, their individual habeas claims were mooted. *Id.* Because the Third Circuit found a lack of standing, the merits of Plaintiffs' constitutional claims related to the *Joseph* hearing were not addressed. As such, this Court's previous substantive analyses in *Gayle II* were vacated, and the case was remanded for a determination whether class certification was appropriate.

After remand, the parties engaged in limited discovery on the issue of class certification. Subsequently, Plaintiffs moved to certify a class. In November 2017, after a rigorous review, I certified the following class: the right of all persons within the District of New Jersey, now and in the future, who are mandatorily detained pursuant to 8 U.S.C. § 1226(c) to obtain a bond hearing on the basis of a substantial claim to relief that would prevent the entry of a removal order, which includes challenging the constitutionality of the *Joseph* hearing process, namely, the allocation of the burden of proof, and the contemporaneous recording of the hearing.

I noted that because Gayle and Sukhu are proper representatives for this class, they have standing to bring the instant matter.

Now, both parties move for summary judgment on the remaining constitutional claims. Briefly, the Government contends that it already bears the initial burden at custody redetermination hearings, and that the Constitution does not require these hearings to resemble pre-merits mini-trials or any contemporaneous recordings. The Government further contends that under 8 U.S.C. § 1252(f)(1), this Court is precluded from granting the requested class injunctive relief. On the other hand, Plaintiffs maintain that they, and the class, must have the opportunity to receive a constitutionally adequate hearing before an immigration judge such that a determination on their mandatory detention can be made. In that connection, Plaintiffs argue that this hearing must be one that (1) does not violate due process and places the initial burden of establishing that an alien falls within Section 1226(c) on the Government; and (2) requires a contemporaneous record of these proceedings. Plaintiffs claim that 8 U.S.C. § 1252(f)(1) does not preclude requested class-wide injunctive relief.

## DISCUSSION

### I. Standard of Review

Courts will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is

"genuine" if supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52. A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *See id.* at 252. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts "in the light most favorable to the [non-moving] party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party then carries the burden to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. Moreover, the non-moving party may not rest upon the mere allegations or denials of its pleading. *Id.* at 324; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A mere "scintilla of evidence . . . will be insufficient." *Anderson*, 477 U.S. at 252.

## II.     Section 1226(c) and *Matter of Joseph*

### A.     Section 1226

I start with an overview of the relevant statutory scheme of Section 1226(c), which governs mandatory detention.  Section 1226 in full reads:

(a) Arrest, detention, and release

11

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General—

(1) may continue to detain the arrested alien; and

(2) may release the alien on—

(A) bond of at least $1,500.; or

(B) conditional parole; but

(3) may not provide the alien with work authorization ... unless the alien is lawfully admitted for permanent residence or otherwise would ... be provided such authorization.

(b) Revocation of bond or parole

The Attorney General at any time may revoke a bond or parole authorized under subsection (a) of this section, rearrest the alien under the original warrant, and detain the alien.

(c) Detention of criminal aliens

(1) Custody

The Attorney General shall take into custody any alien who—

(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) Release

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

8 U.S.C. § 1226.

Section 1226 governs the pre-removal detention of an alien who is present and living in the United States. *See Demore v. Kim*, 538 U.S. 510, 527-28 (2003); *Jennings v. Rodriguez*, 138 S. Ct. 830, 846 (2018); *Nielsen v. Preap*, 139 S. Ct. 954, 959 (2019)("§1226(a) . . . applies to most such aliens, and it sets out the general rule regarding their arrest and detention pending a decision on removal."). In that regard, Section 1226(a) provides the Attorney General the authority to arrest and detain an alien pending a decision on whether the alien is to be removed from the United States, except as provided in Subsection (c). *See* 8 U.S.C. § 1226(a). Distinctly, detention under Subsection (a) is discretionary; that is, the Attorney General may seek to release the alien on bond or parole. *Jennings*, 138 S. Ct. at 846. An alien also has the right to a hearing before an immigration judge to determine whether the alien

should be released on bond, pending any challenge to removal and a decision as to whether that alien is to be removed. *See* 8 U.S.C. § 1226(a).

The exception under Subsection (c), however, directs that for certain categories of aliens, the Attorney General "shall take into custody any alien . . . when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense." 8 U.S.C. § 1226(c)(1). This group of aliens fall into one of the enumerated categories in the statute involving criminal offenses and terrorist activities. *See id.* "Section 1226(c) then goes on to specify that the Attorney General 'may release' one of those aliens '*only if* the Attorney General decides' both that doing so is necessary for witness-protection purposes and that the alien will not pose a danger or flight risk." *Jennings*, 138 S. Ct. at 846 (quoting 8 U.S.C. §1226(c)(2)) (emphasis in the original).

Relevant to the arguments made by the parties, a brief history of enactment of Section 1226(c) is critical. Originating from the comprehensive overhaul of the INA that occurred in the 1980s and 1990s, this specific provision represents a significant change to the government's detention provisions established by the Antiterrorism and Effective Death Penalty Act ("AEDPA") and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). As the Supreme Court explained in *Demore*, Congress was dissatisfied with the Immigration and Naturalization

Service's[9] ("INS") apparent failure to remove deportable criminal aliens. *Demore,* 538

U.S. at 518-21; *see also id.* at 519 (citing Senate report finding that "more than 20%

of deportable criminal aliens failed to appear for their removal hearings"). To reform

the immigration laws, Congress enacted § 1226, which "requir[es] the Attorney

General to detain a subset of deportable criminal aliens pending a determination of

their removability." *Id.* at 521. Section 1226(c) provides for mandatory detention

pending removal proceedings for any alien who has committed certain categories of

crimes. Crucially, an alien mandatorily detained under § 1226(c) has no right to a

bond hearing to seek release from detention by showing that the alien is not a flight

risk or danger to the community; similarly, neither the DHS/ICE nor an immigration

judge has the discretion to release an alien detained under § 1226(c) pending the final

resolution of the alien's removal proceedings, provided that detention has not become

unreasonably prolonged. *See* 8 U.S.C. § 1226(c); *Diop v. ICE/Homeland Sec.*, 656 F.3d

230, 232 (3d Cir. 2011)("At a certain point [under due process of the Fifth Amendment

of the Constitution], continued detention becomes unreasonable and the Executive

Branch's implementation of § 1226(c) becomes unconstitutional unless the

---

[9]    INS is the predecessor to DHS/ICE. *Khouzam v. Attorney Gen. of United States*, 549 F.3d 235, 243 n. 7 (3d Cir. 2008) ("The Homeland Security Act of 2002 ... eliminated the Immigration and Naturalization Service ('INS') and assigned INS's enforcement functions to the DHS's Bureau of [ICE]. . . ."). As part of the Homeland Security Act of 2002, the functions of the INS were transferred from the Department of Justice to three different agencies under the newly formed DHS: ICE, Customs and Border Protection, and Citizenship and Immigration Services, with ICE assuming the majority of the INS's immigration enforcement function. *Lin–Zheng v. Attorney. Gen.*, 557 F.3d 147, 152 n. 4 (3d Cir. 2009) (citing Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135).

Government has justified its actions at a hearing inquiring into whether continued detention is consistent with the law's purposes of preventing flight and dangers to the community.").

## B.       *In re Matter of Joseph*

The dispute in this case centers on the constitutionality of the *Joseph* hearing, which is provided to a § 1226(c) alien who challenges his or her mandatory detention. According to the Government, ICE makes the initial determination that an individual is removable on the ground triggering mandatory detention under Section 1226(c); that decision is made pursuant to a "reason to believe" standard. Then, an alien could challenge that determination pursuant to procedural safeguards announced in *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999). There, the BIA held that an alien whom the INS determined was subject to mandatory detention could request a hearing to prove that INS "is substantially unlikely to establish at the merits hearing, or on appeal, the charge or charges that would otherwise subject the alien to mandatory detention."[10]  *Id.* at 800.

The *Joseph* Board reasoned that the foregoing standard would give both (1) "significant weight" to INS's initial custody determination in line with congressional intent that certain categories of removable aliens should be mandatorily detained, and (2) "genuine life" to the regulation that allows the immigration judge to reexamine the INS's determination. *Id.* at 807. In that regard, the BIA instructed

---

[10]       *Joseph* also requires an individual to demonstrate that ICE is "substantially unlikely to establish that the [individual's] convictions would support a [mandatory detention] charge." *Matter of Kotliar*, 24 I. & N. Dec. 124, 127 (BIA 2007).

immigration judges to "look forward to what is likely to be shown during the hearing on the underlying removal case." *Id.*  In other words, in order to support its "reason to believe" obligation at a preliminary hearing, the INS would not necessarily be required to provide, for example, a certified copy of the alien's conviction that served as the basis for mandatory detention, even though such a document ordinarily would be necessary for the government to meet its burden of demonstrating that the alien should be removed. *See id.*  Indeed, the Board made clear that the standard of proof on the government is less exacting than the one imposed for the merits hearing.

In sum, since *Matter of Joseph*, the initial burden at a *Joseph* hearing is on ICE to establish that there is "reason to believe" that the detained alien is deportable or inadmissible under a ground listed in § 1226(c)(1)(A)-(D).  In order to arrest an alien and issue a Notice to Appear in removal proceedings, ICE must first have "reason to believe that the alien . . . is in the United States in violation of any [immigration] law or regulation and it is likely to escape before a warrant can be obtained for his arrest."[11]  8 U.S.C. § 1357(a)(2).  According to the Government, not disputed by Plaintiffs, in practice, the "reason to believe" standard — in the context of a *Joseph* hearing — has been equated to a finding of "probable cause."  *See Matter of U-H-*, 23 I. & N. Dec. 2355, 356 (BIA 2002)("we determined that the 'reasonable ground to believe' standard is akin to the familiar 'probable cause' standard.").

---

[11]     After an alien is detained, ICE provides the alien with notice of, *inter alia*, the "charges against the alien and the statutory provisions alleged to have been violated." 8 U.S.C. § 1229(a)(1)(D).

Once ICE has carried its initial burden, an alien "may avoid mandatory detention by demonstrating [at a *Joseph* hearing] that he is not an alien, was not convicted of the predicate crime, or that [ICE] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention." *Demore*, 528 U.S. at 514 n.3 (citing 8 C.F.R. § 3.19(h)(2)(ii) and Matter of Joseph, 22 I. & N. Dec. 799); *see Jennings*, 138 S. Ct. at 838 n.1 ("Anyone who believes that he is not covered by §1226(c) may also ask for what is known as a '*Joseph* hearing.'"). The directive of the administrative code, cited by the Supreme Court, is to provide the detained-alien an opportunity to adduce evidence or legal authority on the question whether ICE has properly included him/her within a category that is subject to mandatory detention. *See* 8 C.F.R. § 3.19(h)(2)(ii).[12] If the alien is successful in proving that he or she is not "properly included" under Section 1226(c), by establishing that ICE is "substantially unlikely" to prevail on the charges that trigger mandatory detention, the alien may then proceed to an individualized bond hearing—the same type of custody hearing accorded to those discretionarily detained pursuant to Section 1226(a). *See* 8 C.F.R. § 1236.1(c)(8).

Relatedly, *Joseph* hearings are not contemporaneously recorded verbatim as a matter of policy; rather, *Joseph* hearings are normally summarized by the

---

[12] This code provision states that "[n]othing in this paragraph shall be construed as prohibiting an alien from seeking a redetermination of custody conditions by [ICE] in accordance with part 235 or 236 of this chapter. In addition, with respect to paragraphs (h)(2)(i)(C), (D), and (E) of this section, nothing in this paragraph shall be construed as prohibiting an alien from seeking a determination by an immigration judge that the alien is not properly included within any of those paragraphs."

immigration judge's order determining that a noncitizen is subject to mandatory detention or is eligible for a bond hearing. However, when a party appeals a *Joseph* decision, the judge drafts a short bond memorandum providing the reasons for his or her decision in that context.

## C.    Relevant Supreme Court Cases

To better address the parties' arguments on these motions, I survey the relevant Supreme Court cases, most of which are relied upon by both parties.

### 1.    *Zadvydas v. Davis*

This earlier Supreme Court case concerned 8 U.S.C. § 1231(a)(6), which authorizes the detention of aliens who have already been ordered removed from the country. Under this section, when an alien is ordered removed, the Attorney General is directed to complete removal within a period of 90 days, 8 U. S. C. §1231(a)(1)(A), and the alien must be detained during that period. 8 U.S.C. § 1231(a)(2). After the expiration of that proscribed time period, §1231(a)(6) provides that certain aliens "may be detained" while efforts to complete removal continue. The Supreme Court interpreted this language to limit the government's detention of an alien who has been ordered removed by imposing a six month presumptively reasonable period. *Zadvydas*, 533 U.S. 678, 701 (2001). The Court held that, under § 1231(a)(6), aliens may not be detained beyond "a period reasonably necessary to secure removal." *Id.* at 699. In that regard, the Court concluded that if the alien "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the government must either rebut that showing or release the alien. *Id.*

The Supreme Court based its decision on the fact that § 1231(a)(6) is ambiguous based upon Congress's use of the phrase "may be detained." "May," the Court reasoned, "suggests discretion," but not unfettered discretion. *Id.* at 697. By finding such ambiguity, the Court resorted to employing the canon of constitutional avoidance, which rests on the principle that "[w]hen a serious doubt is raised about the constitutionality of an act of Congress, it is a cardinal [rule] that [ ] [courts] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings*, 138 S. Ct. at 842 (citations and quotations omitted).

2. *Demore v. Kim*

In *Demore*, the Supreme Court held that § 1226(c)'s mandatory detention scheme is not facially unconstitutional. The alien in *Demore* had been detained the day after his release from state custody, and he argued that § 1226(c) violates due process because it allows the Attorney General to detain an alien indefinitely without a finding that the alien is dangerous or a flight risk. *Demore*, 538 U.S. at 514. The Supreme Court rejected that argument, concluding that aliens falling under § 1226(c) may constitutionally be detained "for the brief period necessary for their removal proceedings." *Id.* at 513. The Court distinguished its *Zadvydas* decision, which held that aliens whose deportation is unfeasible (e.g., because no country will accept them) cannot be held indefinitely unless the government demonstrates a continued need for their detention. *Demore*, 538 U.S. at 528. "While the period of detention at issue in *Zadvydas* [after the statutory deadline for an alien's removal has passed] was

'indefinite' and 'potentially permanent,' the detention [under § 1226(c)] is of a much shorter duration." *Id.* (citation omitted). Statistics cited by the Court showed that most removal cases were completed in a few months, and the remainder, on average, were completed in just four months more. *Id.* at 529. Aware of Congressional intent, the Court then balanced the alien's due process rights under the Fifth Amendment and Congress's deep-rooted authority to detain aliens during deportation proceedings. *Id.* at 523. After such a weighing, the Court concluded that the alien's mandatory detention under § 1226(c) did not raise any due process concerns. *Id.* at 529. Indeed, the Court explained that, although aliens are entitled to "due process of law in deportation proceedings," *id.* at 523 (citation and quotations omitted), the government may constitutionally detain deportable aliens "during the limited period necessary for their removal proceedings." *Id.* at 526.

While *Demore* did not place limits on the permissibility of mandatory detention, Justice Kennedy, in joining the majority opinion, made clear that in his view, § 1226(c) should be construed in light of constitutional concerns if an alien's detention became unreasonable or unjustified. *Demore*, 538 U.S. at 532 (Kennedy, J., concurring). Justice Kennedy noted that since mandatory detention under § 1226(c) is "premised upon the alien's deportability," due process requires "individualized procedures" such as a *Joseph* hearing to ensure that the alien is in fact deportable. *Id.* at 531-32. "For similar reasons," he continued, "since the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight

and dangerousness if the continued detention became unreasonable or unjustified." *Id.* at 532. "Were there to be an unreasonable delay by [ICE] in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Id.* at 532-33.

### 3. *Jennings v. Rodriguez*

More recently, in *Jennings*, the Court held — as a matter of statutory construction — that both §§ 1225(b) and 1226(c) unambiguously call for the mandatory detention of aliens within those provisions' purview throughout the pendency of the aliens' removal proceedings, without any right to a bond hearing. *Jennings*, 138 S. Ct. at 842, 845-847. In so holding, the Court overruled the Ninth Circuit, which had applied the doctrine of constitutional avoidance to impose an implicit six-month limit on the period that an alien could be detained under those statues without a bond hearing. *Id.* at 839. The Supreme Court cautioned that the constitutional-avoidance canon is an aid to the interpretation of a statute that could "plausibly be read" either to offend or to comport with the Constitution, *id.* at 843, but could not be used to "graft a time limit" onto an unambiguous statute that could not "reasonably be read to limit detention to six months." *Id.* at 833-844. Concluding from the language and structure of §§ 1225(b) and 1226(c) that their meaning was "clear," the Court declined to extend the rule of *Zadvydas* to aliens detained under those provisions. *Id.* at 848.

*Jennings* did not reach the constitutional questions under due process, such as whether the mandatory detention provision of § 1226(c) violates the Due Process Clause as applied to aliens whose detention has become unusually prolonged. Rather, the Court remanded the case to the Court of Appeals to consider those issues "in the first instance." *Id.* at 851; *see Dryden v. Green*, 321 F. Supp. 3d 496, 501-02 (D.N.J. 2018).[13]

4.    *Nielsen v. Preap*

In the Supreme Court's latest decision, *Nielsen v. Preap*, 139 S. Ct. 954 (2019), the Court dealt with statutory construction of Section 1226(c) in the context of whether an alien is exempt from mandatory detention when ICE fails to take him/her into immigration custody immediately after release from custody. While this case did not directly answer the questions at issue here, the Supreme Court provided some guidance as to how to interpret § 1226(c).

First, the Court began its opinion by acknowledging that "[a]liens who are arrested because they are **believed to be deportable** may generally apply for release on bond or parole while question of their removal is being decided . . . . . Congress has decided, however, that this procedure is too risky . . . for aliens who have committed certain dangerous crimes and those who have connection to terrorism . . . [u[nder § 1226(c) . . . ." *Nielsen*, 139 S. Ct. at 959 (emphasis added). The *Nielsen* plaintiffs argued that they were not subject to § 1226(c)'s mandatory-detention scheme, but

---

[13]    No decision on that issue has been made by the Ninth Circuit or the District Court on remand.

instead were entitled to the bond hearings available to those aliens held under the general arrest and release authority under § 1226(a). These plaintiffs reasoned that they are not the type of aliens described in paragraph (1) of Section § 1226(c) – even though they fall into at least one of the categories of aliens who have committed a crime listed in subparagraph (A)-(D) – because they were not taken into custody by ICE immediately "when released" from prison. *Id.* at 964. The Supreme Court rejected that argument on the basis that it runs counter to the plain language of the statute. The Court held that the "when released" clause "plays no role in identifying for [ICE] *which* aliens [it] must immediately arrest," since only subparagraphs (A)-(D) settle who is "described in paragraph (1)," or in other words, those aliens who committed a crime under those subparagraphs are subject to mandatory detention without regard to when they were released from custody. *Id.* at 965 (emphasis in the original).

Next, the Supreme Court made clear that § 1226(c) and § 1226(a) are not separate sources of arrest, but rather, Subsection (c) merely places a limit on the authority or discretion conferred upon ICE by Subsection (a). *Id.* at 966. In particular,

> subsection (a) creates authority for *anyone's* arrest or release under § 1226 – and it gives [ICE] broad discretion as to both actions – while subsection (c)'s job is to *subtract* some of that discretion when it comes to the arrest and release of criminal aliens. Thus, subsection (c)(1) limits subsection (a)'s first sentence by curbing the discretion to arrest: [ICE] *must* arrest those aliens guilty of a predicate offense. And subsection (c)(2) limits subsection (a)'s second sentence by cutting back [ICE's] discretion over the decision to release: [ICE] may *not* release aliens "described in" subsection (c)(1) – that is those guilty of a predicate offense.

*Id.* (emphasis in the original).

Finally, the Court addressed the plaintiffs' argument on the canon of constitutional avoidance. The plaintiffs maintained that a reading of § 1226(c) that would mandate arrest and detention years after an alien's release from criminal custody – when many aliens will have developed strong ties to the country and a good chance of being allowed to stay if given a hearing – would raise constitutional concerns. The Court disposed of this argument, reasoning that constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* at 972 (citations and quotations omitted). The Supreme Court also stressed that the canon "has no application absent ambiguity." *Id.* (citations and quotations omitted). Because § 1226(c)'s language is clear on its face, the Court found that the canon of constitutional avoidance is plainly inapplicable. *Id.*

## III.    Mandatory Detention

Plaintiffs advance the following arguments: (1) the Due Process Clause of the Constitution prohibits the mandatory detention of individuals with substantial challenges to removability; (2) the burden of proof imposed by the Joseph Hearing is unconstitutional; and (3) Section 1226(c) does not impose mandatory detention on individuals with a substantial challenge to removability. Because the first and third arguments are similar, I will address them first.

## A.    Constitutionality

According to Plaintiffs, under the Due Process Clause, mandatory detention, with no bond hearing, of individuals who raise substantial arguments that they are not deportable is unconstitutional.  This is so, Plaintiffs contend, because such aliens with substantial arguments against deportability do not categorically pose the heightened risk of flight or threat to public safety that justifies such an extreme deprivation of liberty.  To sum up Plaintiffs argument: under Section 1226(c), Congress only intended to give ICE authority to mandatorily detain those aliens who do not have a substantial challenge to their deportation.  I do not agree with Plaintiffs' reading of the statute, particularly in light of the Supreme Court's decision in *Demore*.

"It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Demore*, 538 U.S. at 522 (citations and quotations omitted).  However, relevant here, the Supreme Court has recognized "detention during deportation proceedings as a constitutionally valid aspect of the deportation process." *Id.*  As noted earlier, the Supreme Court has found constitutional the mandatory detention imposed under § 1226(c).  Notwithstanding *Demore*, Plaintiffs contend that their mandatory detention violates due process because they are not "deportable" under the meaning of Section 1226(c).  In that regard, Plaintiffs reason that at the outset, some aliens may have a substantial argument as to why they do not have one of the enumerated removable offenses under Section 1226(c), or that even if these aliens are removable in the threshold sense, some may still have bases

for contesting their removability as a final matter, pursuing relief such as cancellation of removal or adjustment status. What Plaintiffs suggest is that so long as the criminal alien has a substantial reason why he/she is not "deportable," his/her mandatory detention under § 1226(c) would be unconstitutional.

In making their argument, Plaintiffs submit that the Supreme Court in *Demore* recognized a narrow exception to the general rule that due process requires procedures to ensure that detention serves its purposes. In *Demore*, the Supreme Court held that the mandatory detention of criminal aliens under § 1226(c) does not deprive those individuals of their due process rights. *Demore*, 538 U.S. at 529. Plaintiffs, here, argue that the Supreme Court's holding in that regard is only confined to aliens who are deportable, because the petitioner in *Demore* conceded his deportability. Plaintiffs maintain that, here, they stand on a different footing, since they have a substantial challenge to deportability. I disagree. First, I do not find that *Demore*'s holding is only limited to those aliens who have conceded deportability. Even the facts of *Demore* belie Plaintiffs' position. While the Supreme Court noted that the petitioner, there, conceded deportation for the purposes of the habeas petition, he nevertheless had, at the time of the decision, applied for withholding of removal by challenging his deportability. *Id.* at 1717, n.6. But, even in light of that fact, the Supreme Court explained that "by conceding he is 'deportable' and, hence, subject to mandatory detention under § 1226(c), respondent did not concede that he will *ultimately be deported.*" *Id.* (emphasis in the original). Indeed, not once in its decision did the Supreme Court draw such a distinction that Plaintiffs make here.

Rather, in upholding § 1226(c), the Court found that mandatory detention "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully be removed." *Id.* at 528.

Plaintiffs also argue that detaining aliens who have a substantial challenge to deportability does not serve any legitimate governmental interests. They explain that these aliens do not categorically pose the heightened risk of flight or threat to public safety that justifies detention, because by challenging their deportability, they have strong incentives to appear at their proceedings and litigate those defenses. But, as *Demore* made clear, in enacting § 1226(c), Congress sought to impose mandatory detention on those criminal aliens who ICE believes are deportable pending their removal proceedings. Indeed, the Supreme Court recognized Congress's intent that detention is necessary to prevent "deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Demore*, 538 U.S. at 527. This is so because Congress "had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." *Id.* at 528.[14] According to the Supreme Court, such evidence "certainly supports the approach [Congress] selected even if other,

---

[14] Indeed, once released, "more than 20% of deportable criminal aliens failed to appear for their removal hearings." *Id.* at 519.

hypothetical studies might have suggested different courses of action." *Id.* I stress that in coming to this conclusion, the Supreme Court not once made the distinction that its due process holding only applies to aliens who have conceded deportability. In fact, as the Government correctly points out, *Demore* expressly reversed both *Patel v. Zemski*, 275 F.3d 299, 314 (3d Cir. 2001) and *Welch v. Ashcroft*, 293 F.3d 213, 226 (4th Cir. 2002), cases which involved mandatory detention of criminal aliens who *did not* concede removability and, just like the petitioner in *Demore*, had applied for relief from removal. *See Chavez-Alvarez v. Warden York County Prison*, 783 F.3d 469, 473 (3d Cir. 2015)("Congress lawfully required the Attorney General to make presumptions of flight and dangerousness about the alien solely because he belonged to the group of aliens convicted of the types of crimes defined in Section 1226(c). These presumptions, *Demore* says, justified the alien's detention and eliminated the need for an individualized bond hearing . . . ."). As the Supreme Court concluded, "deportation proceedings would be vain if those accused could not be held in custody pending the inquiry into their true character."[15] *Id.* at 523. Accordingly, based on the Supreme Court's reasoning, I reject Plaintiffs' due process arguments regarding § 1226(c) in this context.

---

[15]    Plaintiffs' position that criminal aliens who have substantial challenges to their deportability should not be mandatorily detained raises other concerns. Based on *Demore* and its progeny, it is neither the purpose nor the intent of § 1226(c) to permit the release of criminal aliens – who ICE has reasons to believe are deportable under the statute – simply because they assert a challenge to their deportability. Even if that were so, the question remains who should make the assessment in the first instance that the challenges raised are substantial, such that the alien would not be deportable under the statute. And, relatedly, what would be the standard in making such an assessment.

## B.    Constitutional Avoidance

Next, as a corollary argument, Plaintiffs contend that under the canon of constitutional avoidance, the Court should read § 1226(c) as requiring the mandatory detention only of those aliens who do not have a substantial challenge to deportability.  Plaintiffs explain that such a construction is consistent with the statutory language, because § 1226(c) only imposes mandatory detention if an alien "is deportable by reason of having committed" a predicate criminal offense.  8 U.S.C. § 1226(c)(1(B), (C).  In their view, the word "deportable" is susceptible to two different meanings.  The first interpretation is the Government's position that § 1226(c) applies to all aliens whom it charges as having committed the specified offenses designated by statute, unless the alien proves the Government is "substantially unlikely" to establish that his/her conviction was actually for an offense that falls within a ground of removal listed in the statute.  In Plaintiffs' view, however, § 1226(c)'s use of "deportable" should be read to allow an alien to seek release on bond, so long as he or she has a substantial challenge to his or her deportability.  Based on *Nielsen*, however, I cannot find that "deportable" is ambiguous, such that the canon of constitutional avoidance would apply.

The canon of constitutional avoidance is employed "[w]hen 'a serious doubt' is raised about the constitutionality of an act of Congress," which requires courts to "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."  *Jennings*, 128 S. Ct. at 842 (quotations and citations omitted).  However, the canon can only come into play "when, after the application of

ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* (quoting *Clark v. Martinez*, 543 U. S. 371, 385 (2005)). Importantly, and relevant here, "[i]n the absence of more than one plausible construction, the canon simply 'has no application.'" *Id.* (quoting *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U. S. 483, 494 (2001)).

In construing a statute, the court must begin with the text itself, "and proceed from the understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'" *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013)(quoting *BP America Production Co. v. Burton*, 549 U.S. 84, 91 (2006)). The first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). "When the meaning of statutory text is plain, [courts] inquiry is at an end." *Roth v. Norfalco, L.L.C.*, 651 F.3d 367, 379 (3d Cir. 2011).

If the text is "reasonably susceptible of different interpretations," it may be ambiguous. *Edwards v. A.H. Cornell and Son, Inc.*, 610 F.3d 217, 222 (3d Cir. 2010) (internal quotation marks and citation omitted). Only when a statute appears to be ambiguous, courts may look to other portions of the statute, because "'statutory interpretation focuses on the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *AT&T Mobility, L.L.C. v. Concepcion*, 131 S. Ct. 1740, 1754 (2011)(quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). And, only when a statute is ambiguous and after

consideration of the statutory scheme, may courts consider the legislative history or other extrinsic material — and then, only if it "shed[s] a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

Here, the canon of constitutional avoidance has no application, since the word "deportable" is not susceptible to different interpretations. While Plaintiffs argue that "deportable" should be read to mean an alien who has conceded deportability, a plain reading of § 1226(c) does not support their strained interpretation. Section 1226(a) grants the Attorney General the authority to arrest and detain an alien "pending a decision on whether [that] alien is to be removed from the United States." 8 U.S.C. § 1226(c). While Subsection (a) provides the Attorney General with discretion to release the alien on bond, *see* 8 U.S.C.§ 1226(a)(2), § 1226(c) instructs that "deportable" aliens, who have committed certain enumerated offenses, be mandatorily held without bond. *See* 8 U.S.C. § 1226(c); *Sylvain v. Att'y Gen.*, 714 F.3d 150, 154 (3d Cir. 2013)(holding that Section 1226(c) "imposes mandatory detention on a narrow class of criminal aliens."). Indeed, those include "any alien" who "is inadmissible" under § 1182(a)(2) or is "deportable" under § 1227(a)(2)(A)(ii), (B), (C), (D).[16] The term "deportable" is defined as someone who is "subject to deportation." *See deportable*, Webster's New Collegiate Dictionary (9th ed. 1985), and it modifies the phrase "by reason of having committed any offense." 8 U.S.C. § 1226(c)(1)(A), (B).

---

[16] There is no dispute that the terms "inadmissible" and "deportable" are used similarly in these statutes.

A plain reading of the statute compels only one interpretation; that is, those aliens who are subject to deportation by virtue of committing a certain enumerated offense must be mandatorily detained by the Attorney General, without the possibility of release on bond. Such an interpretation is consistent with the aim of the statute.

Clearly, Section 1226(a) directs the Attorney General to arrest a certain category of aliens, and Subsection (c) instructs that criminal aliens who committed certain enumerated offenses be held on mandatory detention, pending a decision on whether the alien could be removed. In light of this statutory scheme, to adopt Plaintiffs' reading would effectively render § 1226(c) meaningless. Indeed, if § 1226(c) could only apply to an alien who does not challenge his/her deportability – either at the threshold level or adjustment of status – there would be no reason for any removal proceedings; rather, the alien would be ordered removed, since he/she does not contest deportation, and the Attorney General would continue to detain that particular alien under the authority and procedures set forth in 8 U.S.C. § 1231. In that respect, the Government correctly notes that to adopt Plaintiffs' reading would essentially leave no time period during which § 1226(c) could apply.

Furthermore, aside from statutory interpretation, Plaintiffs' position finds no support in the recent Supreme Court cases. In *Jennings*, the Court explained that "§ 1226(c) makes clear that detention of aliens within its scope *must* continue 'pending a decision on whether the alien is to be removed from the United States.'" *Jennings*, 138 S. Ct. at 846 (quoting 8 U.S.C. § 1226(a))(emphasis in the original). In that regard, the Court emphasized that the enactment of § 1226(c) by Congress was its

effort to provide "immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made." *Id.* at 836. In interpreting the language of § 1226(c), the Supreme Court did not read into, or carve out, any exception for those groups of aliens who may have challenges to their deportability. Rather, quite the opposite, the Supreme Court found that all aliens who met the requirements of mandatory detention must be detained until a decision can be made with regard to their removal. In fact, just recently, in *Nielsen*, the Supreme Court stressed that ICE detains criminal aliens pursuant to § 1226(c) because those aliens are "believed to be deportable," not because those aliens have somehow conceded deportability, or otherwise could not contest their removability. *Nielsen*, 139 S. Ct. at 958-59.

Hence, because I find that the term "deportable," in the context of § 1226(c), can only be subject to one interpretation, the canon of constitutional avoidance does not apply. While Plaintiffs raises certain issues that they argue are violations of due process, the Supreme Court has advised that "[s]potting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to 'choos[e] between competing *plausible* interpretations of a statutory text.'" *Jennings*, 138 S. Ct. at 843 (quoting *Clark v. Suarez Martinez*, 543 U.S. 371, 381 (2005))(emphasis in the original). To prevail, Plaintiffs must show that § 1226(c)'s use of word "deportable" is subject to differing meanings. Because they have not done so, I cannot find that the canon of constitutional avoidance has any application here.

Having rejected Plaintiffs' statutory interpretation and due process arguments, I turn to the question whether the burden placed upon the detained-aliens in a *Joseph* hearing violates due process.

## IV.    Constitutionality of the *Joseph* Hearing

Unlike their prior motion for summary judgment, Plaintiffs do not devote a significant amount of their current motion to the constitutionality of *Joseph* hearings. Nonetheless, Plaintiffs argue that *Joseph* severely restricts the type of arguments detainees can make, and that the hearing unconstitutionally places the burden on the detainee to show that the Government is "substantially unlikely" to establish that the alien committed a criminal offense properly included within a category listed in § 1226(c). Accordingly, Plaintiffs argue that in a practical sense, the *Joseph* standard makes it virtually impossible for aliens to contest their mandatory detention.

### A.    *Joseph* Standard

The Government argues that while the *Joseph* standard – which requires an alien to show that ICE is "substantially unlikely" to prove the charges through which mandatory detention is triggered – is not constitutionally impermissible because the standard satisfies the *Mathews* test.[17]    In assessing whether a particular administrative procedure comports with due process, courts should "look to see if the process at issue fits with the notion that '[t]he *fundamental requirement of due process* is the opportunity to be heard at a meaningful time and in a meaningful

---

[17]    In *Mathews v. Eldridge*, the Supreme Court devised a three-part test to determine whether an administrative procedure comports with due process. 424 U.S. 319, 333 (1976). *See, infra.*

manner.'" *Dia v. Ashcroft,* 353 F.3d 228, 239 (3d Cir. 2003)(quoting *Mathews,* 424

U.S. at 333). "(D)ue process is flexible and calls for such procedural protections as the

particular situation demands." *Id.* at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471,

481 (1972)).

> In *Mathews,* the Supreme Court held that the "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009)

(quoting *Mathews*, 424 U.S. at 335).

I note at the outset that whether the *Joseph* standard is constitutionally

adequate still remains an open question even after the various Supreme Court

decisions discussing mandatory detention under § 1226(c).  *See Demore*, 538 U.S. at

514 n.3 ("[W]e have no occasion to review the adequacy of *Joseph* hearings generally

in screening out those who are improperly detained pursuant to 1226(c)."); *Diop*, 656

F.3d at 231 n.8 ("[B]ecause the parties do not question the constitutional adequacy of

a *Joseph* hearing, we decline to address it here. We note, however, that the issue is

an open one . . . .").[18]

---

[18]     At least one Court of Appeals judge, sitting in the Ninth Circuit, has raised questions whether *Joseph* provides an adequate constitutional safeguard for those aliens who wish to challenge the Government's determination that they should be subject to mandatory detention. *See Tijani v. Willis*, 430 F.3d 1241, 1244 (9th Cir. 2005) (Tashima, J., concurring) ("The BIA's Joseph decision was, plainly put, wrong

Because the *Mathews* test is flexible, it is this Court's task to address each factor of the test and, if necessary, weigh them in fashioning a proper remedy. I begin my analysis under *Mathews* by examining whether Plaintiffs have identified a private interest that is affected by the Government's action. Indeed, Plaintiffs have identified a private liberty interest, *i.e.*, remaining free from detention; that the Government's mandatory detention procedures affect this interest; and that a liberty interest may not be impaired without due process of law. *See Demore*, 538 U.S. at 523 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."). Plaintiffs argue that under *Zadvydas*, an alien's liberty interest in freedom from detention is protected by due process, and that the Government must prove a "special justification" outweighing the "individual's constitutionally protected interest in avoiding physical restraint." 533 U.S. at 690. The Government responds that the liberty rights of the aliens are subject to limitations and conditions not applicable to citizens.

The tension here is between Plaintiffs' liberty interests and the Government's authority, granted by Congress, to mandatorily detain deportable aliens who have committed certain crimes. The Government's position places significant emphasis on the third factor of the *Mathews* test – the Government's interests and burdens. On this factor, the Government identifies certain interests that it argues weigh heavily in favor of maintaining the current *Joseph* standard. First, the Government submits

---

. . . . [Joseph] establishes a system of 'detention by default' by placing the burden fully on the alien to prove that he should not be detained.").

that the *Joseph* standard protects the congressional aim of preventing deportable aliens from fleeing the country before their removal proceedings. This interest, indeed, coincides with Congress's stated intent in enacting § 1226(c). Section 1226(c) aims:

> (1) to protect the public from potentially dangerous criminal aliens; (2) to prevent aliens from absconding during removal procedures; (3) to correct former bond procedures under which over twenty percent of criminal aliens absconded before their deportation hearings; and (4) to restore public faith in the immigration system.

*Dean v. Ashcroft*, 176 F.Supp.3d 316 (D.N.J. 2001) (citing S. Rep. No. 104-48, 1995 WL 170285, at *1-6, 9 (1995)), *abrogated on other grounds by Demore*, 538 U.S. at 531.

In addition, these particular interests have been found compelling by the Supreme Court, which held that § 1226(c) is premised on a sufficiently strong special justification so as not to run afoul of the Constitution. *See Demore*, 538 U.S. at 518-21. In so finding, the Court stressed that mandatory detention

> necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed . . . . Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully.

*Id.* at 529. Similarly, the Third Circuit recently reiterated that "Congress adopted the mandatory-detention statute against a backdrop of rising crime by deportable aliens . . . . To make matters worse, many aliens failed to show up at their deportation proceedings . . . . [Section 1226(c)] promotes the public interest by keeping the most

dangerous aliens off the streets." *Sylvain,* 714 F.3d at 159. As the Supreme Court observed in *Demore*, deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character." *Demore*, 538 U.S. at 523 (quoting *Wong Wing v. United States,* 163 U.S. 228, 235 (1896)) (quotation marks omitted).

Second, the current standard preserves the distinction between preliminary or custody hearings and merits hearings, a distinction clearly warranted for procedural and practical reasons. *See, e.g., United States v. Delker*, 757 F.2d 1390, 1396 (3d Cir. 1985) ("Congress [has] warned that bail hearings should not become mini-trials.") (citations omitted); *Kaley v. United States*, 134 S. Ct. 1090, 1101 (2014) ("[T]he Government has a substantial interest in freezing potentially forfeitable assets without an evidentiary hearing about the probable cause underlying criminal charges. At the least, such an adversarial proceeding—think of it as a pre-trial mini-trial (or maybe a pre-trial not-so-mini-trial)—could consume significant prosecutorial time and resources."). To impose a more searching analysis in custody redetermination hearings, such as Plaintiffs' proposed "substantial challenge" standard, would, as argued by the Government, expend more governmental resources and further delay the ultimate disposition of an alien's removal proceedings. As a result, *Joseph* hearings would become more time consuming and complex.

Next, I turn to the second *Mathews* factor — the risk of an erroneous deprivation and the probable value of additional procedural safeguards. *Mathews*, 424 U.S. at 335. Plaintiffs contend that under *Joseph*, the risk of erroneous

deprivations of aliens' liberty interests is impermissibly high. For example, Plaintiffs cite to cases that found that aliens had failed to establish under *Joseph* that ICE was "substantially unlikely" to prevail on its charges, because (1) the alien cannot cite to "precedent case law directly on point,"[19] (2) the alien failed to establish U.S. citizenship with conclusive evidence,[20] or (3) a circuit split or even unpublished case law from within the circuit casts doubt on the alien's removability.[21] Because *Joseph* essentially mandates detention unless ICE's charges are frivolous, and requires that the BIA resolve any doubt arising from incomplete evidence and unsettled law in favor of the Government, Plaintiffs argue that the *Joseph* standard is virtually impossible to satisfy.

---

[19]     *See, e.g., In re Grajeda*, 2010 WL 559182, at *2 (BIA Dec. 15 2010) (rejecting *Joseph* challenge where "the conviction documents contained in the bond record [were] inconclusive with regard to whether the [alien] was removable for commission of a controlled substance violation).

[20]     *See, e.g., In re Romeo Ramirez-Garcia*, 2007 WL 1153825 (BIA Apr. 5, 2007) (rejecting a *Joseph* challenge because evidence that the detainee was a U.S. citizen was "inconclusive"). The Ninth Circuit eventually determined that the individual was a citizen. *See Ramirez-Garcia v. Holder*, 550 Fed. Appx. 501 (9th Cir. 2013). In the meantime, the citizen had been subjected to nearly two and a half years of mandatory detention until his eventual release on an order of supervision. *See Ramriez-Garcia v. Keisler*, No. 07-1902, 2009 WL 111512, at *2 (D. Ariz. Jan. 15, 2009).

[21]     *See, e.g., In re Garcia*, 2007 WL 46699861, at *1 (BIA Nov. 5, 2007) (explaining that "[a] legal argument that deportability will not be established is insufficient to meet the respondent's burden of proof in this matter in the absence of precedent case law directly on point that mandates a finding that the charge of removability will not be sustained."); *In re Flores-Lopez*, 2008 WL 762690 (BIA Mar. 5, 2008) (reversing IJ decision to grant a bond hearing based on a decision in the relevant circuit court that had determined that the offense was not an aggravated felony because that decision was unpublished).

The Government, on the other hand, argues that the preliminary nature of the *Joseph* hearing does not create a constitutionally impermissible risk of erroneous deprivation of an alien's liberty interest, since aliens have another, more substantial bite at the apple to prove they are not subject to Section 1226(c) in their removal proceedings, at which point the burden of proof is on ICE, not the alien. Therefore, requiring the alien to establish the inapplicability of Section 1226(c) under the "substantially unlikely to prevail" standard does not, according to the Government, raise constitutional concerns. Furthermore, the Government advances that the *Joseph* standard is not toothless, because if an alien has a strong facial challenge to a removal ground that triggers § 1226(c) detention, he/she can have it considered by the IJ at a *Joseph* hearing, and if successful, can request a bond hearing and seek release pending determination of whether removal is appropriate, *Joseph I*, 22 I. & N. Dec. at 668, such as, U.S. citizenship, mistaken identity, or vacation of the alleged conviction. *See, e.g., Joseph*, 22 I. & N. Dec. at 806; *Matter of Davey*, 26 I. & N. Dec. 37 (BIA 2012); *In re Hernandez*, 2012 WL 3911850 (BIA 2012).

I now turn to weighing the *Mathews* factors to determine whether the current *Joseph* standards violate the Constitution and if so, what remedy is necessary to prevent such violation. I recognize, as I must, pursuant to the Supreme Court and the Third Circuit precedent, that the Government has a compelling interest under § 1226(c) in detaining aliens pending their removal proceedings and preventing them from absconding during those proceedings, despite competing liberty interests that the Constitution safeguards. However, it is my task to balance governmental

interests with those of the detained aliens. At the outset, I note that Plaintiffs, on this current motion, do not place a significant emphasis on the "reason to believe" standard imposed on the Government in the first instance when it mandatorily detains an alien that ICE believes to have committed an enumerated offense under § 1226(c). Rather, Plaintiffs argue, here, that this Court's previous ruling that the "reason to believe" standard should be defined similarly as a "probable cause" standard does not sufficiently protect those aliens with substantial challenges to their ultimate deportability. The Government, for its part, does not address the "reason to believe" standard in its brief. Because I find, just as I did in my last ruling on this issue, that the "reason to believe" standard does not meet constitutional safeguard under due process, I address that issue, below.[22]

I have surveyed BIA decisions involving *Joseph* hearings and the inconsistencies in the manner in which the IJs have applied the "reason to believe" standard, and hence, I find that there is a real risk that the liberty interests of a narrow class of aliens — those who cannot establish that ICE is "substantially unlikely" to prevail in its charges against them but who are ultimately not subject to Section 1226(c) — will be erroneously deprived of their liberty. My analysis begins

---

[22]    While I acknowledge that some BIA decisions have equated the "reason to believe" standard to "probable cause," that standard has not been applied uniformly. Furthermore, although the Government conceded in the last go around that the probable cause standard is appropriate, it has not done so this time. But, I remain convinced that the probable cause standard applies in determining whether the Government has any reason to believe that an alien should be mandatorily detained under § 1226(c). As such, it is necessary and appropriate, in my decision here, to address this issue once again.

with the "reason to believe" standard that ICE uses to issue its NTAs, and that the IJs also use to test the sufficiency of the Government's evidence in the first instance during the *Joseph* hearing.

The "reason to believe" language is set forth in the regulations and the commentary accompanying them: an authorized ICE agent may detain an alien if there is "reason to believe that this person was convicted of a crime covered by the statute." 63 Fed. Reg. 27444; 8 C.F.R. § 236.1; *Diop*, 656 F.3d at 230. The law is clear that this determination is made at the agency level in the first instance. However, what is not clear is whether an IJ uses the same standard to assess the Government's initial burden at a *Joseph* hearing. And, if the IJ does indeed analyze the matter using the "reason to believe" standard, the Government nowhere explains what considerations go into the IJ finding a "reason to believe" that an alien is subject to mandatory detention under Section 1226(c). I find that the Constitution demands a more exacting or easily definable standard under the *Mathews* test, particularly since the Supreme Court has recognized the importance of the protections the *Joseph* hearing is intended to afford. *See Demore*, 538 U.S. at 514 n.3.

The confusion begins with the *Joseph* decision. Under that decision, it is not clear that ICE explicitly bears any sort of evidentiary burden at a *Joseph* hearing. The *Joseph* court stated,

> the "reason to believe" that the alien "falls within a category barred from release," which led the [INS] to bring a particular charge, can often be expected to suffice until the Immigration Judge resolves the merits of the removal case, a resolution that frequently occurs speedily in cases involving detained criminal aliens. But the Immigration Judge is able to examine the basis for that charge and make an independent

> determination whether the alien "actually falls within a category of aliens subject to mandatory detention." In requiring that the Immigration Judge be convinced that the Service is substantially unlikely to prevail on its charge, when making this determination before the resolution of the underlying case, we provide both significant weight to the Service's "reason to believe" that led to the charge and genuine life to the regulation that allows for an Immigration Judge's reexamination of this issue.

*Joseph*, 22 I. & N. Dec. at 807. Nowhere does the BIA delineate the requirements of the "reason to believe" standard. Rather, since the *Joseph* decision immigration courts have focused almost exclusively on *Joseph*'s language imposing the burden on the alien to prove that ICE is "substantially unlikely to prevail." *See, e.g.*, *In Re: Raul Capi-Esquivel A.K.A. Raul Esquivel-Capi,* 2011 WL 1792600, at *1 (DCBABR Apr. 13, 2011) ("In a so-called '*Joseph*' hearing, the respondent bears the burden of establishing that DHS would be substantially unlikely to prevail on a charge of removability under a section of the Act mandating custody."). However, there is no case that outlines what type of initial burden ICE bears at a *Joseph* hearing. Moreover, even if ICE has an initial burden of proof, it is unclear how an IJ evaluates whether ICE has met that burden. Compounding the problem, the Government has not cited any uniform standard by which to assess the Government's initial burden under the "reason to believe" analysis. Among its inadequacies, questions remain (1) whether the reason to believe analysis imposes a subjective standard or otherwise; (2) whose belief the IJ must evaluate; and (3) what, if any, evidence would be sufficient to justify the belief. And, finally, there is scant precedent to guide the IJs. This ill-defined process raises the vexing question of how an alien is able to prepare his or her argument against mandatory detention. Based on the current standard, it

is likely that an individual may be deemed subject to mandatory detention even if ICE merely presented a scintilla of unrefuted evidence. This result, as a matter of constitutional jurisprudence, is a serious deprivation of an alien's liberty interest that is not justified by the Government's interests under § 1226(c).

Accordingly, because the Government's initial burden, i.e., "reason to believe" that the alien is subject to mandatory detention, at the *Joseph* hearing is virtually undefined—and, at best, minimal—and the individual's burden under the "substantially unlikely" standard is particularly heavy, I find that the current *Joseph* hearing standard creates a high risk of an erroneous deprivation of Plaintiffs' liberty interests. Having made that finding, I, next, determine to what standard the Government should be subjected in carrying its initial burden at a *Joseph* hearing.

To begin, the Government has, during this litigation,[23] equated the "reason to believe" standard to that of a probable cause inquiry. That standard, however, has not been articulated or adopted by immigration judges or even the Government itself. I find the probable cause standard is sufficient to ameliorate any potential wrongful deprivation of liberty an alien may suffer in light of his or her "substantially unlikely to prevail" burden at *Joseph* hearings. In fact, if ICE were to establish to the satisfaction of an IJ at the *Joseph* hearing that there is probable cause to place an alien in mandatory detention, prior to the alien presenting his or her objections, the alien would be in a better position to meet the "substantially unlikely" burden that

---

[23]    Indeed, as recently as its opposition to Plaintiffs' renewed motion for class certification filed in May 2017, the Government continued to assert that the "reason to believe" standard equates to a probable cause inquiry.

the alien currently bears. This conclusion has substantial support in the case law. *See Mich. v. Summers*, 452 U.S. 692, 697 (1981).

On one hand, probable cause, albeit in a criminal context, protects an individual's liberty under the Constitution; such protection cannot be compromised. *See id.* Because mandatory detention in the immigration context deprives aliens of their liberty interests, it is prudent to impose the probable cause standard to protect those interests. This makes practical sense, because the probable cause inquiry has been the subject of numerous court decisions and the parameters of this standard are well-known. In that regard, immigration judges would have at their disposal an arsenal of precedents to guide them in determining whether the Government has met such a burden. On the other hand, heeding the Supreme Court's admonition that the purposes of § 1226(c) mandatory detention are compelling, as is the Government's interest in efficiently administering justice, the Court finds that the probable cause standard sufficiently takes into account those governmental interests, while adequately balancing the liberty interests of individuals.

The probable cause inquiry does not require a rigorous showing by the Government, nor any burdensome or rigid analysis on the part of an IJ. In fact, the probable cause standard would only place a minimal additional burden on the Government. To illustrate, in the *Joseph* context, under a probable cause analysis, an IJ would examine whether the facts and circumstances, based upon reasonably trustworthy information, are sufficient to warrant a prudent man to believe that the alien is subject to mandatory detention under § 1226(c). *See United States v. Burton*,

288 F.3d 91, 98 (3d Cir. 2002). Probable cause requires "the kind of 'fair probability' on which 'reasonable and prudent people, not legal technicians, act.'" *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013). While the test is "fluid," importantly, and contrary to the current "reason to believe standard," it contains an objective component – the "reasonably prudent man" standard – which can adequately be reviewed by judges. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). By contrast, the "reason to believe" standard, to the extent it exists as ICE's burden of proof in a *Joseph* hearing, has no clear objective component.

Importantly, requiring ICE to satisfy the IJ that there is probable cause for mandatory detention before the alien has to prove that ICE is "substantially unlikely" to prevail at the merits hearing, does not disturb congressional intent to prevent potentially deportable aliens from committing more crimes or fleeing before their removal proceedings; as always, an individual who has succeeded in a *Joseph* hearing would then proceed to a bond hearing, where he or she may still be subject to detention if an IJ determines the alien is a flight risk or a danger to the community.

I note, however, in the criminal context, in evaluating whether there was probable cause to search or make an arrest, courts examine the facts and circumstances known to the officer at the time he or she took action. *See Burton*, 288 F.3d at 98. Here, because Plaintiffs only challenge the standards applied at the hearing, not at ICE's initial custody determination, I make no findings about the constitutional adequacy of ICE's initial determination in issuing an NTA. Rather, the probable cause inquiry imposed by the Court here only concerns an IJ's initial

determination whether the Government's evidence supports a finding that the alien is subject to § 1226(c)'s mandatory detention. In that regard, the IJ should examine the facts and circumstances known to ICE, and of which ICE has reasonably trustworthy information, at the time of the *Joseph* hearing to determine whether a reasonably prudent person would believe that the alien had committed the offenses triggering mandatory detention.

Plaintiffs argue that the probable cause standard does not prevent the mandatory detention of an immigrant who presents a strong legal argument that his/her conviction does not render him/her deportable. However, as I have found, the probable cause standard only speaks to the Government's initial burden. Rather, substantively, Plaintiffs' argument goes to the alleged inadequacies of the *Joseph* hearing as a whole, which includes the burden that the aliens have at the next stage of the hearing — whether the Government is "substantially unlikely to prevail" at the merits hearing violates due process. I turn to that question next.

There is no dispute that the alien bears a high burden of proof at a *Joseph* hearing. Plaintiffs argue that such a burden should not survive constitutional scrutiny. However, in light of the imposition of a probable cause inquiry as the Government's initial burden at a *Joseph* hearing, I do not find that Plaintiffs' subsequent burden at the *Joseph* hearing violates due process. On this particular inquiry, I must balance the interest of the Government against the liberty concerns of the alien. There is no doubt that Congress has a compelling governmental interest in regulating, and the authority to regulate, the conduct of aliens. *Flores*, 507 U.S.

at 303-06.  To that end, in general, "detention during the deportation proceedings [is] a constitutionally valid aspect of the deportation process."  *Demore*, 538 U.S. at 523. Indeed, the reason that an alien's right to liberty is circumscribed is because of national interest considerations.  A reading of *Demore* suggests that the Government need not bear a heavy burden to justify detaining an alien pending a more formal hearing.  To require more, would impermissibly undermine ICE's authority and the purposes underlying § 1226(c).  As Justice Kennedy wrote: "due process requires individualized procedures to ensure that there is at least some merit to [ICE's] charge, and therefore, sufficient justification to detain a lawful permanent alien pending a more formal hearing."  *Demore*, 538 U.S. at 531 (Kennedy, concurring). The "substantially unlikely" standard imposed on a detained-alien, in my view, passes the "at-least-some-merit" review.

Moreover, the Supreme Court has advised, albeit not in the context of a *Joseph* hearing, that preliminary hearings are different and distinct from final hearings on the merits.  *See Morrissey*, 408 U.S. at 488.  The difference, as the Supreme Court advised, is that preliminary hearings are less formal and not rigorous, while merit hearings call for formal findings of fact and conclusions of law.  *Id.* at 487.  In that connection, preliminary and final hearings each impose different evidentiary standards.  *Id.* at 490-91.  Here, the *Joseph* hearing and the final removal hearing, too, are separate and distinct proceedings, each with a different set of burdens of proof.  According to Plaintiffs, at a *Joseph* hearing, so long as the alien can show that he or she has a substantial challenge to the Government's determination under §

1226(c), he or she should not be subject to mandatory detention. However, in order for an IJ to decide whether an alien has a substantial challenge, the IJ would necessarily engage in a potentially more expansive analysis of the merits of an alien's detention. This type of review could obviate the purpose of, and the need for, a final removal hearing.

After a weighing of the different interests, I do not find that the Constitution requires altering the alien's burden of proof at a *Joseph* hearing. On one hand, because I recognize that the alien has a liberty interest in not being erroneously detained by the Government, the imposition of a probable cause standard will protect against such errors. On the other hand, however, the private interest does not outweigh the Government's compelling interest, as set forth by the Supreme Court and the Third Circuit, in detaining aliens who have committed certain crimes pursuant to § 1226(c). To impose a higher burden on the Government than the current standard would severely undermine the purposes of the statute.

In sum, I grant in part Plaintiffs' summary judgment motion by imposing a probable cause standard on the IJ's initial determination of whether the Government has a sufficient basis to detain individuals under § 1226(c). At that juncture of the proceedings when probable cause is obtained and when the alien has the opportunity to object to the bases for his or her mandatory detention, the alien will have received adequate due process under the law. I grant in part the Government's motion in this context and dismiss Plaintiffs' claim that the *Joseph* hearing, as a whole, violates due process.

## V. Lack of a Contemporaneous Verbatim Record

Both parties move for summary judgment on Plaintiffs' claim that the Government's policy of not requiring contemporaneous verbatim records of *Joseph* hearings be made and kept has resulted in statutory and constitutional violations under the Fifth Amendment's Due Process Clause. The Government argues[24] that a contemporaneous verbatim record of *Joseph* hearings is not required by the INA and its applicable regulations, the Third Circuit, the Supreme Court, or the Constitution. In support, the Government points to (1) the distinction between merits hearings and preliminary hearings (into which they classify *Joseph* hearings) codified in the INA,[25] its regulations,[26] and the Executive Office of Immigration Review's operating

---

[24] At the outset, the Government raises the familiar argument that because the Named Plaintiffs never made any factual challenges to their detention or removability at *Joseph* hearings, they cannot assert "as-applied" claims to the conduct of hearings that never took place. But, as the Court has already defined, the Named Plaintiffs represent a class of aliens, now and in the future, who are mandatorily detained pursuant to § 1226(c), and that they allege the absence of a contemporary recording violates due process. In that regard, the alleged constitutional infirmity that flows from such practice is the very type of categorical harm that this Court may consider under the *Mathews* test. *See*, *infra*.

[25] *Compare* 8 U.S.C. § 1229a(b)(4)(C) requiring a "complete record . . . of all testimony and evidence produced" in a removal proceeding *with* 8 U.S.C. § 1226 (containing no such specific requirement with respect to the process of ascertaining whether an alien is subject to mandatory or discretionary immigration detention).

[26] *See, e.g.*, 8 C.F.R. § 1003.19(d) (consideration of custody matters "shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding"); *accord Matter of Guerra*, 24 I. & N. Dec. at 40 n.2 ("Bond proceedings are separate and apart from the removal hearing."); *see also Matter of Adeniji*, 22 I & N. Dec 1102, 1115 (BIA 1999) (noting that an IJ writes up a bond memorandum as a record of a bond proceeding).

51

manual;[27] and (2) the Supreme Court's decision not to impose a contemporaneous verbatim records requirement in criminal trials.[28]

Plaintiffs, on the other hand, urge the Court to conduct an independent analysis of whether due process compels the availability of a contemporaneous verbatim record of *Joseph* hearings under the *Mathews* balancing test. Under the *Mathews* test, Plaintiffs argue, Plaintiffs' substantial private interests in remaining free and preventing errors resulting from memorandum decisions prepared after-the-fact outweigh the minimal burden ICE would incur in activating the recording equipment already installed and used in other contexts by the immigration courts.

As with my due process analysis of the *Joseph* standards, because the parties do not dispute whether Plaintiffs have identified a substantial private interest in remaining free from detention under *Mathews*, the Court turns to the next factor of analysis: "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335.

To begin, I look for guidance from due process case law in other contexts. In that regard, I find the non-dispositive nature of *Joseph* hearings similar to the

---

[27]    Immigration Court Practice Manual § 9.3(e)(iii) ("Bond hearings are generally not recorded."); *see also Matter of Chirinos*, 16 I. & N. Dec. 276, 277 (BIA 1977) ("[T]here is no right to a transcript of a bond redetermination hearing. Indeed there is no requirement of a formal 'hearing.'").

[28]    *Mayer v. City of Chicago*, 404 U.S 189, 193-94 (1971) (requiring "that the State must afford the indigent a record of sufficient completeness to permit proper consideration of (his) claims" but noting that "[a] record of sufficient completeness does not translate automatically into a complete verbatim transcript").

preliminary hearings held for parolees who have potentially violated their parole. In *Morrissey*,[29] the Court examined the minimum due process requirements for such preliminary hearings as well as the final parole revocation hearing. At the preliminary hearing, the Court found that

> [t]he hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given in support of parole revocation and of the parolee's position. Based on the information before him, the officer should determine whether there is probable cause to hold the parolee for the final decision of the parole board on revocation. Such a determination would be sufficient to warrant the parolee's continued detention and return to the state correctional institution pending the final decision. . . . [T]he decision maker should state the reasons for his determination and indicate the evidence he relied on but it should be remembered that this is not a final determination calling for formal findings of fact and conclusions of law. No interest would be served by formalism in this process; informality will not lessen the utility of this inquiry in reducing the risk of error.

*Morrissey*, 408 U.S. at 487 (internal citation and quotation marks omitted). Similar to the parolees in *Morrissey*, alien detainees under Section 1226(c) are entitled to a hearing to determine whether ICE is "substantially unlikely to establish at the merits hearing, or on appeal, the charge or charges that would otherwise subject the alien to mandatory detention." *Joseph*, 22 I. & N. at 806. Even if the IJ presiding over a *Joseph* hearing finds that the Government is substantially likely to prevail on its charges and the alien is ordered into mandatory detention, the alien receives another chance to contest the applicability of Section 1226(c), or any other basis to contest

---

[29] While I note that the liberty interest at stake in *Morrissey* is not the same as the liberty interest at stake here, *see, supra*, I do find that the existence of a preliminary and final procedure in the parole revocation context and the attendant recording requirements useful for comparison purposes.

removal, in the ensuing removal proceedings, and to potentially secure freedom from detention as well as from removal.[30] Put differently, because of the preliminary nature of *Joseph* hearings, under *Morrissey*, there is no constitutional infirmity in failing to require a contemporaneous verbatim record in *Joseph* hearings. *See Fahy v. Horn,* 516 F.3d 169, 190 (3d Cir. 2008) (While "[i]t is indisputably true that a criminal defendant has the right to an adequate review of his conviction, i.e., a sufficiently complete record . . . . , neither the Supreme Court, nor our Court, has held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief.")(citing *Mayer v. City of Chicago*, 404 U.S. 189, 198 (1971)).

As a practical matter, the typical evidence presented at a *Joseph* hearing also weighs against the necessity of requiring contemporaneous verbatim records in such hearings, and Plaintiffs fail to demonstrate otherwise. *Joseph* hearings generally turn on a review of conviction records and consideration of the arguments of counsel, as opposed to sworn witness testimony. Thus, "even though the only record of a *Joseph* hearing is the IJ's resulting order, which may simply be a check mark on the Form I-286 or a written summary order," a detainee's arguments against mandatory detention can still be presented on appeal without the aid of a contemporaneous verbatim record.

---

[30]    Further, as the Third Circuit found in *Diop*, an alien who has been subjected to mandatory detention for an unreasonably prolonged amount of time before removal proceedings is accorded an individualized bond determination, mitigating the liberty interest impairment created by mandatory detention. *Diop,* 656 F.3d at 221.

Still, Plaintiffs argue that there are instances where the contemporaneous record is necessary to "detect" abuses of discretion and misconduct by IJs. While I certainly recognize that there have been circumstances of misconduct by IJs, particularly those that have been previously identified by the Third Circuit, *see Qun Wang v. Attorney General*, 423 F.3d 260, 268 (3d Cir. 2005)(finding inappropriate the "bullying" nature of the immigration judge's questioning), these types of misconduct, while flagrant, do not go to the ultimate substantive question of whether a lack of record keeping during a *Joseph* hearing is unconstitutional. As such, Plaintiffs fail to tangibly demonstrate the risk of erroneous deprivation of their liberty interest resulting from the lack of a contemporaneous verbatim record.

Moreover, IJs are not prohibited from recording *Joseph* hearings, and existing immigration procedures already provide that formal bond hearings may be required when prejudice would result from following more informal procedures. Because of these already existing safeguards, "there is no requirement in bond proceedings for a formal hearing and that informal procedures may be used so long as no prejudice results." *In Re Mohammad J.A. Khalifah*, 21 I. & N. Dec. 107, 112 (BIA 1995). Because I find that a summarized record of *Joseph* hearing proceedings is adequate for purposes of appeal, I find that the second *Mathews* factor weighs against requiring contemporaneous verbatim records of *Joseph* hearings.

As to the third prong of the *Mathews* analysis, Plaintiffs argue that the Government has little interest in maintaining its current policy of not requiring contemporaneous verbatim records in *Joseph* hearings, because digital audio

recording equipment is available in every immigration court that conducts any hearing granted to an alien detained under 8 U.S.C. 1226(c) who requests a custody redetermination. Plaintiffs also point out that the Government has conceded that it is no more burdensome for the IJ to record a *Joseph* hearing than a removal hearing, which is always recorded. Tellingly, the Government does not articulate the extent to which requiring a contemporaneous verbatim record in *Joseph* hearings would impose a fiscal or administrative burden. Conceivably, I recognize that there would be at least some minimal administrative burden in requiring records to be kept. That said, however, the minimal burden of record keeping is counterbalanced by the burden currently imposed on the IJs when they are called upon to issue memoranda of reasoning if an appeal were taken. Stated differently, should a recording be kept of the *Joseph* hearings, presumably, any factual or legal findings would be placed on the record; in that sense, there would be little need for the IJs to issue any written decisions, particularly since a transcript of the proceedings would be available. Therefore, I find that the Government would bear no additional burden in complying with a contemporaneous verbatim records requirement for *Joseph* hearings. This third *Mathews* factor is equipoised.

Finally, the parties discuss the import of the decision in *Singh v. Holder*, wherein the Ninth Circuit held that a contemporaneous verbatim record was required in *Casas* hearings. *Singh*, 638 F.3d 1196 (9th Cir. 2011). However, the Court finds *Singh* distinguishable because the hearings at issue in that case materially differ from *Joseph* hearings. *Casas* hearings are "bond hearings for aliens facing prolonged

detention while their petitions for review of their removal orders are pending." *Id.* at 1200. Because they are individualized hearings turning on whether an alien is a flight risk or a danger to the community, *Casas* hearings often involve witness testimony in the form of direct and cross-examination as well as a more general examination of an alien's personal history. *See id.* at 1201-02. *Joseph* hearings, on the other hand, solely consider evidence pertaining to an alien's citizenship status and/or past convictions to determine whether ICE is "substantially unlikely" to prevail in its "charge or charges that would otherwise subject the alien to mandatory detention." *Joseph*, 22 I. & N. Dec. at 806. Because any prejudice that would result from failing to require a contemporaneous verbatim records requirement in *Joseph* hearings is significantly lower than that which would result from failing to contemporaneously record the testimony and statements made at *Casas* hearings, I do not find the Ninth Circuit's holding in *Singh* persuasive for the purposes of my analysis here.

I conclude that under a balancing of the *Mathews* factors, while an alien's interest in remaining free is indisputably substantial, the lack of a contemporaneous verbatim transcript in the *Joseph* hearing does not create a high risk of erroneous deprivation of an alien's liberty interest. Further, requiring contemporaneous verbatim records would not add substantial value as a procedural safeguard. While I have found that the Government would bear no additional burden resulting from requiring contemporaneous verbatim records of *Joseph* hearings, a weighing of all the *Mathews* factors tip against finding such a constitutional requirement. *See, e.g.*, *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 642 (6th Cir. 2005) (finding that while the

57

administrative cost of a proposed alternative procedure "would likely be minimal, the additional safeguard in this case is negligible" and accordingly finding due process "do[es] not warrant such a safeguard").

I caution that my legal holding rests solely upon the minimal protection that the Constitution requires. But, as a matter of sound practice, recording the *Joseph* proceedings would be a preferable practice, particularly since there is virtually no additional burden on the part of the Government or the immigration courts to implement such a procedure, and the equipment is generally available. In my view, whenever an individual's liberty is at stake, any protections to avoid errors should be considered and encouraged. Nonetheless, since that protection is not constitutionally required, I grant summary judgment for the Government on this issue.

## VI. Injunctive Relief

The Government argues that under 8 U.S.C. § 1252(f)(1), the Court is barred from granting injunctive relief to the putative class of plaintiffs even in the event that the Court finds they have been harmed, because Section 1252(f)(1) bars courts other than the Supreme Court from enjoining or restraining the operation of Section 1226(c). *See* 8 U.S.C. § 1252(f)(1).[31] Plaintiffs, however, argue that they do not seek

---

[31]     8 U.S.C. § 1252(f)(1) states,

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an

to enjoin or restrain the operation of Section 1226(c), but rather request that the Government be enjoined from violating or misapplying the statute. On this issue, the Court has already considered and addressed the Government's position. In the March 14th opinion, I stated,

> [i]n focusing on the nature of Plaintiffs' challenge—which, again, is based on the claim that the Government's current mandatory detention procedures violate the INA—it does not appear that § 1252(f)(1) precludes Plaintiffs from pursuing injunctive relief. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir.2010) ("Section 1252(f) prohibits only injunction of 'the operation of' the detention statutes, not injunction of a violation of the statutes."). Plaintiffs are not challenging mandatory detention per se, acknowledging that such a challenge is not available in light of the *Demore* decision. Instead, Plaintiffs question the constitutional adequacy of the *Joseph* hearing and related procedures meant to ensure that the Government mandatorily detains only those aliens who should be detained under § 1226(c). In light of this, and given the Government's cursory treatment of this issue and the lack of authority to support its position, the Court declines to dismiss Plaintiffs' claims for injunctive relief at this point. In any event, Plaintiffs clearly may seek class-wide declaratory relief without running afoul of § 1252(f). *Alli v. Decker*, 650 F.3d at 1016.

*Gayle*, 4 F.Supp.3d at 721. In asking the Court to rule otherwise, the Government has not presented any bases to disturb my previous reasoning in this context. Therefore, the Government's argument is rejected.

As a result of my findings herein, during a custody redetermination hearing, i.e., *Joseph* hearing, the Government must initially satisfy an immigration judge that there is probable cause to find that that a detained alien falls within the mandatory detention requirements under Section 1226(c).

---

individual alien against whom proceedings under such part have been initiated.

## CONCLUSION

On a final note, there is no doubt that the current immigration climate has led some aliens, particularly those who are in the United States legally and have been in this country for many years, i.e., legal permanent residents as are the Named Plaintiffs here, to be wary of their status. More and more immigrants have resorted to challenging, in courts, certain policies and laws in order to defend their asserted rights to remain in this country. Indeed, the mandatory detention scheme under § 1226(c) and the Supreme Court decisions upholding various aspects of that statute, have had a deleterious effect on the aliens who are detained by ICE. I am well aware of these potentially harsh consequences and that there may be better options to treat these individuals; nonetheless, having survived constitutional muster, the appropriate forum to address § 1226(c) is Congress.

For the foregoing reasons, the Court decides the parties' summary judgment motions as follows: both parties' summary judgment motions are **GRANTED** in part and **DENIED** in part as to Plaintiffs' claim related to the constitutionality of the *Joseph* hearing; specifically, the Court issues a class-wide injunction that directs the Government to initially satisfy an immigration judge that there is probable cause to find that a detained alien under § 1226(c) falls under the mandatory detention requirements under that statute. The Government's motion is **GRANTED** as to all other claims, including Plaintiffs' constitutional challenge to a lack of contemporaneous verbatim records in *Joseph* hearings.

An appropriate order shall follow.

Date: September 3, 2019                    /s/          Freda L. Wolfson
                                           Freda L. Wolfson
                                           U.S. Chief District Judge